[S.F. No. 22863. In Bank. July 25, 1972.]

M. ARTHUR GENSLER, JR., & ASSOCIATES, INC., et al.,
Plaintiffs and Respondents, v.
LARRY BARRETT, INC., Defendant and Appellant.

**COUNSEL**

Angell, Adams & Holmes and Samuel L. Holmes for Defendant and Appellant.

Howard, Prim, Smith, Rice & Downs, Denis T. Rice, Stuart R. Pollak, Ralph James Mooney and Stephen M. Tennis for Plaintiffs and Respondents.

**OPINION**

**McCOMB, J.**—This is an action to foreclose mechanics' liens filed by plaintiffs M. Arthur Gensler, Jr. & Associates, Inc., and Lambert & Wells Construction Company, an architectural firm and a general contractor,

respectively, in connection with services performed by them in remodeling the third floor of defendant's building for its lessee, Tourist Information Program Service ("TIPS"). The issues raised on appeal were first raised in defendant's trial briefs, filed after the evidence was in.

In late April 1968 Barrett leased 13 offices on the third floor of its premises located at 420 Taylor Street, San Francisco, for a period of five years to TIPS, a corporation which at that time was beginning to do business in the field of closed-circuit television broadcasting. Prior thereto TIPS had occupied two or three offices on this floor on a rental basis and the question of remodeling and painting had been discussed with Jack Barrett, an officer of defendant corporation. He had conveyed to the other officers (his father and brothers) TIPS' request that Barrett participate in this, but they had declined and the premises were leased on an "as-is" basis.

Shortly after the execution of the lease TIPS entered into an oral contract with Gensler under which the latter was to perform certain architectural and design services in connection with remodeling. On May 23, 1968, TIPS entered into a written contract with Lambert & Wells for the performance by it, and its subcontractors, of the actual remodeling. TIPS was "occupying" a portion of the premises when Lambert & Wells commenced work, and TIPS continued such use and occupation during all the time that plaintiffs were working on the premises.

The original contract between TIPS and Lambert & Wells specified a ceiling price for the work to be done by it and its subcontractors as $4,925. This was modified on May 26 to raise the ceiling price to $20,174.67. The building permit applied for by Lambert & Wells on May 24 stated that the value of the proposed work was $1,780. After reviewing the plans the building superintendent issued the permit for *$2,100*. Benjamin Wells testified that the building inspector thought that the job would go higher than $1,780 and had crossed out that amount. He did not apply for a new building permit when the ceiling price on the contract was raised. He testified that subcontractors applied for their own permits, that his permit was for labor and materials only and did not include overhead and profit, that normally he did not apply for a new building permit when a change order came in increasing the amount of the contract unless this was asked for by the inspector on the job, and that 95 percent of the time the inspector does not ask for a new permit unless the scope of the job is radically changed.

TIPS encountered financial difficulty while the work was in progress

and attempted to obtain additional financing without success. It was unable to pay Gensler anything and was unable to continue to pay Lambert & Wells. All anticipated that the work would be recommenced and finished as soon as financing was obtained and that the interruption would only be temporary. Mr. Wells testified that he was on the job once a week discussing the matter with TIPS and trying to get the job going again, and that right up to the time of filing the lien TIPS stated they "would get the ball rolling again."

On November 13, 1968, each of the plaintiffs filed a notice of claim of lien on Barrett's property at 420 Taylor Street pursuant to section 1193.1 of the Code of Civil Procedure.[1] On February 10, 1969, this action was commenced. No preliminary notice was given by plaintiffs; no notice of completion or cessation was given by Barrett as provided in sections 1193.1 and 1183.1.

The court found that TIPS was the "lessee and statutory agent" of Barrett in connection with the improvements and the contracts above described; that at all times during the remodeling Barrett had knowledge of the work being performed on its property; that it filed no notice of completion or notice of cessation and no notice of non-responsibility; that at all times during the remodeling TIPS was "occupying and using the premises," that this occupation and use was partial and was pending completion of the work called for under plaintiffs' contracts with defendant, that it continued in identical form following the interruption of the project, that it was at no time and in no way inconsistent with present or future work on the premises by plaintiffs; and that the work called for under the contracts was never substantially completed.

Finding 14 read: "Defendant's briefs after trial presented three legal defenses, none of which was specifically alleged in its answer or other pleadings: (a) that Lambert & Wells was in violation of the building permit provision of the San Francisco Building Code; (b) that Barrett's statutory agent, TIPS, was in use or occupation of the premises on which plaintiffs performed the agreed-upon services; and (c) that neither plaintiff sent a preliminary notice of the type described in section 1193(a)[2] of the Code of

---

[1] Unless otherwise specified all citations herein are to the Code of Civil Procedure. In 1969 the sections dealing with liens of mechanics and others upon real property (§§ 1181-1203.1) were repealed and incorporated into the Civil Code, section 3082 et seq. (operative January 1, 1971).

Section 1193.1, Code of Civil Procedure, is now Civil Code sections 3093, 3097, 3115 to 3118.

Section 1183.1, Code of Civil Procedure, is now Civil Code sections 3128, 3129.

[2] Note: now sections 3097 and 3114, Civil Code.

Civil Procedure. However, none of the three defenses is supported by the facts.

"(a) As to the first such defense, Lambert & Wells was not in violation of the provisions of the Building Code; even if it were, the Code does not contemplate voiding all causes of action based on construction performed in violation of the building permit requirements;

"(b) TIPS was not in use or occupation of the premises of a type inconsistent with further work on and completion of plaintiffs' contracts on the premises; and

"(c) Plaintiffs both had direct contracts with Barrett's lessee and statutory agent, TIPS, and Barrett knew of plaintiffs' work on the premises from and before its inception and at all times thereafter."

In its conclusions of law the court stated (1) that TIPS was for purposes of the present action the lessee and statutory agent of Barrett within the meaning of the state mechanics' lien law; (2) that plaintiffs each entered into valid and binding contracts with TIPS (acting as Barrett's lessee and statutory agent) for the goods and services actually provided by plaintiffs to TIPS and Barrett; (3) that plaintiffs complied with all licensing requirements and regulations for performance of their contracts; (4) that each plaintiff filed its notice and claim of lien within the time allowed by law; that since Barrett neither filed a Notice of Completion nor a Notice of Cessation plaintiffs had 90 days after completion of the work in which to file their notices and claims of lien; and that this 90-day period did not begin to run until 60 days after the interruption of the project; (5) the notices and claims of lien conformed in all respects to all legal requirements; (6) the complaint was filed within the time allowed by law; (7 and 8) that each of the plaintiffs performed services on the premises at 420 Taylor Street, with the knowledge of, and pursuant to the authority of Barrett; that the goods and services furnished for the remodeling of Barrett's building were, under law, furnished at Barrett's special instance and request and each plaintiff had a direct contract with Barrett within the meaning of section 1193, subdivision (a); and (9) in light of all the above, plaintiffs are entitled to judgment as follows: for Gensler, $994.85, for Lambert & Wells, $6,448.42, with interest thereon at 7 percent per annum from November 1, 1968, and all costs of suit;[3] and for both plaintiffs, liens upon defendant

---

[3]The reasonable value of work actually performed by Lambert & Wells and its subcontractors was found to be $11,848.42, of which only $5,400 had been paid, leaving a total of $6,448.42. The reasonable value of work actually performed by Gensler was found to be $994.85, no portion of which had been paid.

Barrett's real property located at 420 Taylor Street, San Francisco, and foreclosure of said liens by means of sheriff's sale.

The appeal raises the same issues raised by the briefs filed after trial.

*Question:* One. *Were Lambert & Wells in violation of the provisions of the Building Code? If so, did this vitiate its claims to a mechanic's lien as a matter of law?*

■■■ *No.* If there was any violation it was at most a technical one and was not sufficient to invalidate the contract upon which Lambert & Wells relied to enforce its claim to a mechanic's lien.[4]

A permit was obtained pursuant to the 1965 San Francisco Building Code (part II, chapter 1, § 301 et seq.). Section 301 thereof provided that it is "unlawful" for any person to commence or proceed with the alteration or repair of any structure in the city without first obtaining a building permit. No permit is required for painting, interior decoration, etc. The original contract price herein, $4,925, was shown to be a maximum or ceiling price; Lambert & Wells submitted the plans to the building superintendent, valuing the work to be performed by them coming within the permit at $1,780; and after reviewing the contract the superintendent raised this to $2,100. While the ceiling price was later raised to approximately $20,000 the record disclosed that part of the work was to be done by subcontractors, part of the "cost" included overhead and profit, and that some of the work could be done without a permit.

Section 304 of the Building Code provided that any modifications in the application or the plans shall be subject to further approval and shall be subject to all the requirements of a new application; that the permit issued is a license to proceed with the work; that it is not authority to violate any of the provisions of the code; and that issuance of the permit does not "prevent the Superintendent from thereafter requiring correction of errors in plans, or in construction, or of violations of the code or of any law or ordinance." The work must be commenced within 90 days; if it is abandoned or suspended for a period of 90 days without obtaining an extension of time, a "new permit" is required in order to recommence work. A separate permit is required for changes in plans or in the character of the work under any of the conditions specified in Table 3 A, subdivisions (a) through

---

[4]While the defense of illegality was not pleaded, there was evidence at the trial as to the issuance of the building permit; the permit was in evidence, as were the contracts; and the trial court apparently took note of the building code sections. If the testimony produces evidence of illegality, this becomes a question of law which the court may consider of its own motion. (See *Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 148 [308 P.2d 713].)

(f). Under subdivision (a) a separate permit is required where the estimated value of the additional work or the value of the changes exceeds 10 percent of the value of the approved permit work; (b) if there is a change in the type of construction; (c) if there is a change in occupancy or use, as defined; (d) if there is a substantial change in the original approved plans, although the cost, type of construction, occupancy, may remain the same, and the superintendent shall rule on such changes; (e) there is an unusual condition that should require usual permit procedure to protect the interest of the public; or (f) if certain changes are proposed.

It was a question of fact for the trial court whether the evidence showed any violation of the code provisions. The evidence supports the finding that "Lambert & Wells was not in violation of the provisions of the Building Code." The original permit notified the city of the existence of the contract and the general nature of the work to be performed; the work was interrupted and not recommenced, so that no inspection was made by the superintendent and no request made for an amended building permit; and there was evidence that amended permits are customarily obtained only when requested by the superintendent after inspecting the job.

The Building Code provided only two effects where work was done without a permit: a special investigation and an additional investigation fee of 10 times the amount of the permit fee (§ 322). There is nothing in the code to indicate that the drafters intended that building permits which are not amended to show a raised contract price render the construction contract unenforceable. At most the violation, failure to apply for an amended permit, affected only the revenue-raising provisions of the code and not those directed at public protection.[5] The evidence adduced by Barrett on this issue went to the increase in contract ceiling price, not to increase in work which might endanger life and limb, health and public welfare, the safety of workers or the safe use of buildings.

■ Although the courts generally will not enforce an illegal contract, in some cases the statute making the conduct illegal, in providing for a fine or administrative discipline, excludes by implication the additional penalty involved in holding the illegal contract unenforceable.[6] (*Keller* v. *Thornton*

---

[5] Section 102 states that the purpose of the code is "to safeguard life and limb, health and public welfare by regulating . . . and controlling the design, construction, remodeling, alteration, repairing . . . of structures or parts thereof . . . ; the safety of workers and others during these operations, and the safe use of such buildings. structures and land . . . ."

[6] Section 805 of the Building Code makes it a misdemeanor to fail to follow code provisions or to comply with it in any manner.

*Canning Co.* (1967) 66 Cal.2d 963, 966 [59 Cal.Rptr. 836, 429 P.2d 156].) Sometimes the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. "In each such case, how the aims of policy can best be achieved depends on *the kinds of illegality and the particular facts involved"* (*Lewis & Queen* v. *N. M. Ball Sons, supra,* 48 Cal.2d 141, 151).

■ The contract of Lambert & Wells, and the mechanics' liens based thereon, were not rendered illegal as a matter of law by reason of the technical failure to secure an amended building permit.

Two. *Were the claims of lien timely filed?*

*Yes.* ■ In an action to foreclose a mechanic's lien the plaintiff must plead and prove facts showing his substantial compliance with the statutory requirements relative to the filing of his claim of lien, including the fact that the claim of lien was filed within the prescribed period. (*Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 238 [273 P.2d 5].) ■ What is the prescribed period depends upon a construction of the pertinent statutes. This is a matter of law which may be independently determined on appeal. Here the construction of the pertinent statute involves a review of the history of the statute and a determination whether the present statute indicates a legislative intent that it should be subject to the same judicial interpretation as the prior statute. Briefly, it may be stated that plaintiffs claim they are entitled to a period of 150 days within which to file their notice of lien; defendant claims that only a 90-day period applies. The notices of claim of lien were filed more than 90 days but less than 150 days from the last date on which work was done on the contracts.

Section 1193.1, subdivision (a), provided: *who* may file a claim of lien, —an original contractor after the completion of his contract, and every other person after he has ceased to perform labor or furnish material for any work of improvement; and *when,*—before the expiration of the periods of time provided in this section.

Subdivision (c) provided that the owner shall within 10 days after the completion of the work of improvement file for record a notice of completion, pursuant to subdivision (f). If so filed, then an original contractor must file his claim of lien within 60 days thereafter; every other person must file within 30 days thereafter. If no notice of completion is filed, then all persons claiming the benefit of the chapter shall have 90 days after the completion of the work of improvement within which to file their claims of lien.

Subdivision (d) provided what shall be deemed equivalent to a completion where there is no actual completion: (1) the occupation or use of a work of improvement by the owner, or his agent, accompanied by cessation from labor thereon; (2) the acceptance by the owner, or his agent, of the work of improvement; or (3) after the commencement of a work of improvement, a cessation of labor thereon for a continuous period of 60 days. If the owner files for record a notice of cessation, pursuant to subdivision (h), notice of claim of lien must be filed within 30 days after the owner's filing of notice of cessation "except that the time for and manner of filing claims of lien where there has been such a cessation of labor shall be as provided in subdivisions (g) and (h) of this section."

Subdivision (g) provided: "If, after the commencement of a work of improvement, there shall be a cessation of labor thereon for a continuous period of 60 days, then all persons claiming the benefit of this chapter shall within 90 days from the expiration of such 60-day period file for record their claims of lien; provided, that if, after there shall be a cessation of labor thereon for a continuous period of 30 days or more, the owner files for record a notice of cessation as provided in subdivision (h) of this section, every original contractor must within 60 days . . . and every other person . . . must within 30 days . . . file for record his claim of lien. Nothing contained in this subdivision shall, however, extend the time for filing for record of a claim of lien required to be filed for record by reason of the filing for record prior to cessation of a notice of completion as provided in subdivision (b)."

Eliminating the time provisions applicable where the owner has filed a notice of completion "(c)" a notice of cessation "(h)" pursuant to section 1193.1, or a notice of nonresponsibility (§ 1183.1, subd. (b)), because none of those notices were filed in this matter, and eliminating the time provisions applicable where the work has been completed (§ 1193.1, subd. (c)) because the work was not substantially completed, we turn then to constructive completion as defined in section 1193.1, subdivision (d).

Re-examining subdivision (d), the questions presented are whether plaintiffs come within (1) or (3) thereof and when the time began within which they had to file notices of lien claims. Under (1) "the occupation or use of a work of improvement by the owner, or his agent, accompanied by cessation from labor thereon" is the equivalent of completion. We note the finding that there was *partial* occupation by defendant's lessee and statutory agent during the remodeling period pending completion of the work, that this occupation and use continued in identical form following the

"interruption of the project," and that it was at no time and in no way in-consistent with present or future work on the premises by plaintiffs. We note also the language of former section 1187 (Stats. 1897, pp. 202-204) upon which the section 1193.1 was based (Stats. 1951, p. 3290; Stats. 1919, pp. 190-191) and the judicial interpretation of "occupation or use" under the former statute.

From 1897 until 1911 the predecessor statute provided tests for constructive completion, including " . . . and in all cases the occupation or use of a building, improvement, or structure, by the owner, or his representative . . . and cessation from labor for thirty days upon any contract or upon any building . . . or the alteration . . . thereof . . . ." Under that wording of the statute the cessation of labor had to exist for 30 days and it was consistently held that "The occupation or use, however, which under the statute is to be deemed conclusive evidence of completion, must be open, entire and exclusive, and not of such a character as would be consistent with a continuance by the contractor in the completion of his contract; and whether in any particular case there has been such occupation or use must be determined from the facts of that case, as in the ordinary case must be determined from the fact of actual completion. The owner must be shown to have acted towards the contractor and in reference to the building in such way as by necessary implication to give notice that the building has been accepted by him in satisfaction of the contract." (*Willamette etc. Co.* v. *College Co.* (1892) 94 Cal. 229 [29 P. 629]; see also *Orlandi* v. *Gray* (1899) 125 Cal. 372 [58 P. 15]; *Farnham* v. *California Safe Deposit & Trust Co.* (1908) 8 Cal.App. 266 [96 P. 788]; *C. Ganahl Lumber Co.* v. *Weinsveig* (1911) 16 Cal.App. 687 [117 P. 954].)

Under the 1897 statute the Legislature clearly indicated that there was constructive completion when there was occupation *and* cessation from labor for 30 days.[7] It was a question of fact what constituted "occupation" and when "cessation from labor" occurred.

Section 1193.1, subdivision (d)(1) required "occupation and use" ac-

---

[7]Under the 1897 statute, *occupation or use* (as construed by the courts) *not inconsistent with further work performance* and cessation of labor for a durational period of 30 days were required. In 1911 (Stats. 1911, pp. 1316-1317) the statute was amended to provide in the alternate, that occupation or acceptance or cessation from labor for 30 days was equivalent to completion. The Legislature returned to a *conjunctive* version in 1919 (Stats. 1919, pp. 190-191) and provided that occupation or use accompanied by cessation from labor thereon; or cessation from labor for 30 days, was the equivalent of completion. This section was recodified in 1951 and renumbered section 1193.1, subdivision (d)(1), with no change in meaning from the 1919 version (Stats. 1951, p. 2958).

companied by cessation from labor on the work of improvement, but it did not state a durational period for such cessation. It is arguable, and defendant so argues, that the Legislature purposely omitted any time requirement for cessation when it was accompanied by occupation and use, otherwise there would be no significance to the separate provision for subdivision (d)(3) (that mere cessation of labor constitutes the equivalence of completion when it extends for a continuous period of 60 days), and that it is only in situations which come within subdivision (d)(3) that the provisions of subdivision (g) applied, extending the 90-day time limit for filing claims of lien to commence from the expiration of the 60-day period.

However, the question remains as to what constitutes "occupancy and use" within the meaning of section 1193.1, subdivision (d)(1). It seems reasonable to conclude, as the trial court did, that this occupancy signals an equivalent to completion of the job only if it did not co-exist with the labor throughout or is somehow inconsistent with further work by the mechanic. In those cases where the occupancy does co-exist with the performance of the labor or is consistent with further work by the laborer, then the so-called "occupancy" has not indicated constructive completion; there has been only a cessation of labor, which must continue for 60 days before the 90-day period during which the lien must be filed commences. ■ The court's finding as to the nature of the occupancy and use in this case would, therefore, bring this matter within the provisions of subdivision (d)(3). In such case plaintiffs had 150 days in which to file their notices of lien claims, and the liens herein were timely filed.

Three: ■ *Are plaintiffs' claims barred because of their failure to file preliminary notices pursuant to section 1193, subdivsion (a) of the Code of Civil Procedure?*

*No.* In 1967 section 1193 provided in subdivision (a) that "*Except one under direct contract with the owner* or one performing actual labor for wages, every person who furnishes labor, service, equipment or material for which a lien otherwise can be claimed under this chapter, . . . must, as a necessary prerequisite to the validity of any claim of lien . . . cause to be given to the owner or reputed owner, . . . a written preliminary notice as prescribed by this section." (Italics added.) The section prescribed that the notice should contain a general description of the labor, service, equipment or materials furnished; the name and address of the person furnishing same; the name of the person who contracted for same; a description of the jobsite sufficient for identification; a statement that if the bills for such labor, etc. were not paid that the improved property might be subject to mechanics' liens.

A correlative section, pertinent also to this case, was section 1183.1. Subdivision (b) thereof provided that all alterations or repairs, work or labor done or materials furnished upon any land, shall be held to have been "constructed, performed or furnished at the instance of" the owner of the land or person having or claiming an interest therein and that "such interest owned or claimed shall be subject to any lien filed in accordance with the provisions of this chapter, unless such owner . . . shall, within 10 days after he shall have obtained knowledge of such construction, alteration or repair or work or labor, give notice that he will not be responsible for the same by posting a notice in writing to that effect in some conspicuous place upon the property, and shall also, within the same period, file for record a verified copy of said notice in the office of the county recorder . . . ."

Section 1183.1, subdivision (b) (requiring the owner's posting and filing of nonresponsibility) was construed to be "for the benefit of the owner and he must avail himself of it or otherwise, according to its terms, his interest will be liable for the lien (*Pacific Sash & Door Co.* v. *Bumiller* [1912] 162 Cal. 664, 667 [124 P. 230 . . .]). The basis of the section is estoppel (*Nolte* v. *Smith* [1961] 189 Cal.App.2d 140 [11 Cal.Rptr. 261, 87 A.L.R.2d 996]). The noncontracting owner is placed in the position of a party to the contract by the conclusive presumption that the work was done at his instance and request. This is no hardship on the owner since he must have knowledge of what is being done to his property before the presumption arises. *Krenwinkle* v. *Henne*, 42 Cal.App. 580, 584-585 . . . )." (*Halspar, Inc.* v. *La Barthe* (1965) 238 Cal.App.2d 897, 899 [48 Cal.Rptr. 293]; hg. den. Feb. 16, 1966.)

The rationale of *Halspar*, is that if a lien claimant contracts directly with the lessee, and the lessor knows of the construction and fails to file a notice of nonresponsibility, such claimant then has a " 'direct contract with the owner' " for the purposes of section 1193. (*Benson Elec. Co.* v. *Hale Bros. Assoc., Inc.* (1966) 246 Cal.App.2d 686, 693 [55 Cal.Rptr. 73].)

*Scott, Blake & Wynne* v. *Summit Ridge Estates, Inc.* (1967) 251 Cal. App.2d 347 [59 Cal.Rptr. 587], involved the same issue and the decision was based on *Halspar*. There it was further contended that the reasoning of *Halspar* does not make sense in the light of subdivision (b) of section 1193 which read "Any agreement made or entered into by an owner whereby the owner agrees to waive the rights or privileges conferred upon him by this section shall be void and of no effect." It was held (p. 354) "This argument ignores the difference between waiver and estoppel. The

knowledge of the owner referred to in section 1183.1, subdivision (b), is knowledge of actual construction, not intended construction. (*Arthur B. Siri, Inc.* v. *Bridges,* 189 Cal.App.2d 599, 601 [11 Cal.Rptr. 322].) The basis of section 1183.1, subdivision (b), is estoppel. (*Halspar, Inc.* v. *La Barthe, supra,* 238 Cal.App.2d 897, 899.) Section 1193, subdivision (b), invalidates a waiver of the right to prelien notice[8] by agreement before construction of the work covered by the agreement commences. Section 1183.1, subdivision (b), estops an owner from disclaiming responsibility for work performed on his land with his actual knowledge unless he files a notice of nonresponsibility."

It is here urged that the rationale of the cases just considered does not apply because it was not shown that here the owner, Barrett, had *actual knowledge* of the work or services. This was a matter of proof at the trial court upon which evidence was taken. The court made findings (9) that at all times during the remodeling Barrett had knowledge of the work being performed on its property, reciting some of the evidence to this effect and (14)(c) that plaintiffs both had direct contracts with Barrett's lessee and statutory agent, TIPS, and Barrett knew of plaintiffs' work on the premises from and before its inception and at all times thereafter; and made a conclusion of law (8) that the goods and services furnished by plaintiffs for the remodeling of Barrett's building were, under law, furnished at the special instance and request of Barrett and each plaintiff had a direct contract with defendant Barrett within the meaning of section 1193, subdivision (a) of the Code of Civil Procedure.

Defendant urges that at most this shows constructive knowledge, not actual knowledge. Defendant did not raise this issue until after all the evidence was in, and the failure to do so was objected to by plaintiffs as a fatal variance and waiver by Barrett. Plaintiffs urge that had this issue been raised before the close of evidence they would have had an opportunity to prove facts sufficient to overcome them and to show that Barrett acquired substantially all of the information required in the statutory notices. Nonetheless it failed to file the notice of nonresponsibility, and should be estopped to now raise this as a defense. Plaintiffs urge, further, that even conceding *arguendo* that the evidence was insufficient to give Barrett actual or imputed knowledge by July 15, 1968, or reason by that date to inquire and know the requisite facts to invoke section 1183.1, it is beyond question that such knowledge was obtained by November 13, 1968, the date the liens were filed. Barrett still declined to file any notice of

---

[8]A prior statute required notice prior to filing lien; the pertinent statute required notice preliminary to commencing work or furnishing services.

nonresponsibility. Subsequently on December 4 TIPS initiated bankruptcy. Plaintiffs assert that had Barrett filed the nonresponsibility notice they would have had other options available, such as working out a creditors' composition to preclude bankruptcy or to pierce the TIPS' corporate veil in those proceedings.

The failure to raise this defense until after all the evidence was in precludes its now being raised.

The judgment is affirmed.

Wright, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.