ELLANOR ANN FONDREN, SHARON COCHRAN AND SEBS CORPORATION, APPELLANTS, v. K/L COMPLEX LTD., EXCALIBUR PRODUCTS, LTD., AND TOLEDO MANUFACTURING COMPANY, INC., RESPONDENTS.

No. 20603

November 7, 1990                                   800 P.2d 719

*Michael B. Springer* and *Stephen Sprinkel,* Reno, for Appellants.

*Lionel Sawyer & Collins* and *Paul D. Bancroft,* Reno, for Respondents.

## OPINION

*Per Curiam:*

### Facts

In 1983, Appellant Ellanor Ann Fondren (Fondren) leased space in a commercial building she owned on Tahoe Boulevard in Incline Village, Nevada, to Ralph Spinelli (Spinelli). The space leased by Fondren to Spinelli was designed to accommodate a restaurant and it was Spinelli's intent to open a new restaurant, "Tahoe Junction."

Remodeling began on the leased space in May 1983. In the process of remodeling the restaurant, Spinelli contracted with respondents K/L Complex d/b/a Allan King & Friends (King), Excalibur Products, Ltd. (Excalibur), and Toledo Manufacturing Company, Inc. (Toledo). King performed a variety of services including development of design and layout drawings, performance of process inspections, review of the installation of kitchen equipment and preparation of all areas to comply with health department regulations. Toledo provided "custom built" items to match the design and layout of the restaurant. This included, in part, booths, wine bottle displays and storage, and associated pilasters and moldings and two mirrored sections which were installed on an existing wall. Excalibur supplied kitchen equipment.

Following remodeling, Tahoe Junction opened for business in September 1983. However, a fire on October 3, 1985 caused substantial damage to the interior of the premises and forced the permanent closure of the establishment.

On October 11, 1985, King, Toledo and Excalibur executed mechanics' liens against the premises. King claimed a mechanics' lien for design, consulting services and labor. Toledo's lien was for the value of goods it supplied to the premises. Excalibur claimed a lien for the deficiency it suffered in the resale of the equipment they repossessed. In April, 1984, Tahoe Junction filed for protection under the U.S. Bankruptcy Code but the premises reverted back to Fondren. Eventually, Excalibur and Toledo retook possession of the property they had supplied and an action was brought to foreclose on the liens.

On December 28, 1988 the trial court granted respondents' motion for partial summary judgment concerning the issue of whether or not the mechanics' liens had been properly perfected. The trial court then heard evidence on the remaining issues and entered judgment foreclosing the mechanics' liens. This appeal was taken by Fondren. She raises three issues.

## Discussion

Fondren first challenges the trial court's entry of partial summary judgment on the issue of the perfection of the mechanics' liens. The essential facts are not in dispute.[1] The material facts regarding the issue of the perfecting of the mechanics' liens show that Fondren failed to record a notice of non-responsibility and that respondents King, Toledo and Excalibur did not deliver a pre-lien notice to Fondren. Fondren simply argues that the trial court failed to properly apply the law to the given facts.[2] To support her argument, Fondren relies on NRS 108.234 for the proposition that it places lessors, upon whose property improvements are being made and who fail or elect not to file a notice of nonresponsibility, on the same footing as an owner who is having a general contractor improve his property. Based on this reliance

---

[1] NRCP 56(c) allows summary judgment when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Wiltsie v. Baby Grand Corp., 105 Nev. 291, 292, 774 P.2d 432, 433 (1989).

[2] Specifically, the trial court held:

Fondren knew that a work of improvement was to occur on the property she was leasing to RASA, she was apprised of the progress of construction and she approved specific construction activities. She did not, however, file the notice of nonresponsibility provided for in N.R.S. Section 108.234. Consequently, the work each Plaintiff performed is deemed to be "at the instance of such owner." Since the Plaintiffs are deemed to have a direct contract with the owner, they were not required to deliver the prelien notice specified in N.R.S. Section 108.245. *Matter of Stanfield,* 6 B.R. 265 (Bankr.D.Nev. 1980); *Gould v. Wise,* 18 Nev. 253, 3 P. 20 (1884); *see Arthur Gensler, Jr. & Associates v. Larry Barrett, Inc.,* 103 Cal.Rptr. 247, 499 P.2d 503 (1972). Furthermore, the actual notice of construction independently satisfies the requirements of Section 108.245. *Board of Trustees v. Durable Developers,* 102 Nev. 401, 724 P.2d 736 (1986). Fondren's contention that she did not know the various subcontractor's names or the extent of RASA's expenditures, misses the point: she knew that a construction project was underway on the Property. At that point, service of a prelien notice would have been a vain and useless act because she had notice. Instead, her knowledge that construction was underway places the burden on her to file the notice of nonresponsibility.

on NRS 108.234, Fondren asserts that the trial court's reliance on Board of Trustees v. Durable Developers, 102 Nev. 401, 724 P.2d 736 (1986), was erroneous and the partial summary judgment must be reversed. This argument is meritless.

We have previously held:

> [S]ubstantial compliance with the technical requirements of the lien statutes is sufficient to create a lien on the property where, as here, the owner of the property receives actual notice of the potential lien claim and is not prejudiced.

Board of Trustees v. Durable Developers, Inc., 102 Nev. 401, 410, 724 P.2d 736, 743 (1986).

Additionally, it has been held that:

> [T]he purpose of the pre-lien statute is to put the owner on notice of work and materials furnished by *third persons* with whom he has no direct contact.
>
> If the owner fails to file a notice of nonresponsibility within the time provided in the law, *after knowledge of the construction*, the statute provides that the construction is at the instance of the owner. It is a "direct contract."

Matter of Stanfield, 6 B.R. 265, 269 (Bankr.D.Nev. 1980) (emphasis in original).

In this case, it is clear that Fondren had actual knowledge of the construction on her property. It was understood by both Fondren and Spinelli that substantial remodeling would be required when the lease was negotiated. Additionally, Fondren's attorney regularly inspected the progress of the remodeling efforts. These inspections were on behalf of Fondren. *See* Gould v. Wise, 18 Nev. 253, 3 P. 30 (1884) (actual knowledge of owner's agent will be imputed to the owner for purposes of this statute). Fondren could easily have protected herself by filing a notice of non-responsibility. She had actual knowledge of the work being performed on her property.

Furthermore, a pre-lien notice was not required. This reasoning is supported by a line of cases from California, including M. Arthur Gensler, Jr. & Associates, Inc. v. Larry Barrett, Inc., 103 Cal.Rptr. 247, 499 P.2d 503 (1972), which is very similar to the instant case on its facts. In *Gensler,* as here, the lessor argued that the lien claims were barred because there had been no pre-lien notice as required by Section 1193(a) of the California Code of Civil Procedure. The court in *Gensler* held that:

> [I]f a lien claimant contracts directly with the lessee, and the lessor knows of the construction and fails to file a notice of

nonresponsibility, such claimant then has a "direct contract with the owner" for the purposes of section 1193.

*Id.* at 255, 499 P.2d at 511.

The purpose underlying the notice requirement is to provide the owner with knowledge that work and materials are being incorporated into the property. The failure to serve the pre-lien notice does not invalidate a mechanics' or materialmen's lien where the owner received actual notice. *See* Board of Trustees v. Durable Developers, *supra.*

In the instant case, the evidence supports the conclusion that Fondren had actual knowledge of the work of improvement. Delivery of any pre-lien notice would have accomplished little or nothing and, therefore, was not required.

The trial court was correct in its application of the law to the facts before it and Fondren's challenge against the partial summary judgment is without merit.

Next, Fondren asserts that the trial court's findings that Toledo and Excalibur provided lienable improvements, i.e., fixtures, is not supported by substantial evidence. Fondren argues that the court below should have found that the items provided by both Toledo and Excalibur were "trade fixtures," which are not subject to mechanics liens. "Real property is subject to a mechanic's lien for labor and material *only* if the chattels became fixtures attached to the realty . . . and the labor performed resulted in a permanent improvement to the realty." Cornell v. Sennes, 95 Cal.Rptr. 728, at 731 (Cal.App. 1971). *Cornell* also held that: "There were three factors used in making the determination of whether or not an item is either a 'fixture' or a 'trade fixture.' These three factors are: (1) annexation, (2) adaptation and (3) intent." *Id. See also* Reno Electric Works, Inc. v. Ward, 51 Nev. 291, 274 P. 196 (1929) (all-important questions are intent, use and fitness for intended use).

The annexation test is met where the chattel is actually or constructively joined to the real property. Rayl v. Shull Enterprises, Inc., 700 P.2d 567, 570-71 (Idaho 1984).

The adaptation test is met when the object in question is adapted to the use to which the real property is devoted. *Id.* at 571. However, the most important factor in making the determination of whether an item is a fixture for purposes of a mechanics' lien is the intention of the parties at the time the items were installed. *Id.*

The trial court specifically held that as to both Toledo and Excalibur there was sufficient evidence on each of the three tests

to find a valid mechanics' lien. We sustain the court's holding as to Toledo. However, as to Excalibur, we must reverse.

The items supplied by Toledo clearly fall within the traditional notice of "fixtures" for purposes of a mechanics' lien. First, the booths, wine cabinets and other items provided by Toledo were annexed to the property. They were physically attached to the building and had become a part thereof.

Second, the adaptation test was clearly met by the fixtures provided by Toledo. The section of Fondren's building housing the Tahoe Junction restaurant was specifically designed for the restaurant and was used almost exclusively as such. The items provided by Toledo were "custom built" to match the design and layout of the building. Additionally, the color of the fabric covering the booths was "truly unique," making the booths not readily usable anywhere else. Finally, it appears clear that the parties to the agreement intended the "custom built" goods supplied by Toledo to be fixtures. The design was unique and specially suited to use in the restaurant. Additionally, it is clear from the record that the parties intended to have these fixtures remain with the building following the termination of the lease. Therefore, in conclusion, we hold that the items supplied by Toledo were fixtures and the trial court properly foreclosed the mechanics' lien on those fixtures in Toledo's favor.

With respect to the trial court's finding that the kitchen equipment supplied by Excalibur were fixtures, we reverse. The evidence of record supports the conclusion that the kitchen equipment consisted of "trade fixtures" that were not subject to a mechanics' lien.

First, the three-part test of annexation, adaptation and intent was not met. Excalibur provided kitchen equipment which was basic and necessary for the operation of the restaurant. None of the equipment provided was attached to the building such that it became part of the realty. The only real connection occurred through electric, gas and water hookups and sheer weight. Removal of these trade fixtures in no way necessitated any change or damage to the premises. Furthermore, it is not clear that the parties intended this equipment to remain with the premises after the termination of the lease, an inference warranted by Excalibur's retrieval of the equipment at Fondren's request.

Finally, Fondren argues that the trial court erred in granting King a lien for the services he provided. The basis for her

argument is two fold. First, she contends that King was not a licensed architect, contractor or construction manager as required by NRS chapters 623 and 624. Second, she asserts that King's lien claim included non-lienable services. This argument is without merit.

· The statute defining the practice of architecture requires both a "holding out to the public" and "rendering or offering to render services." King never held himself out to be an architect. King worked as a food facility designer and as a member of the International Food Service Consultant Society. His primary responsibilities were to arrange the furniture to maximize the efficient operation of the kitchen and for aesthetic effect. To construe King's responsibilities and work as falling within the definition of "architecture" would ascribe an overly broad meaning to the term.

Additionally, King did not operate as a contractor. Jack Morgan (Morgan) was employed by RASA as the general contractor. It was Morgan who signed for the necessary building permit and accepted responsibility for insuring that all of the construction met code standards. King only worked with Morgan concerning the appearance of pony walls and raised floors, not how to construct them. King also signed a contract on behalf of an absent Spinelli giving the building department the name of the contractor for purposes of the building permit, insuring that electrical and plumbing connections were in the right location for placement of the kitchen equipment, and granting subcontractors access to the building. None of these activities may be construed as a basis for characterizing King as a contractor within the well understood meaning of the profession.

King was not operating as an architect, contractor or construction manager. He did not have the necessary control over the structural features of the building. There was no violation of the statute. The trial court's finding is supported by substantial evidence of record.

Fondren also argues that King's lien must fail because his claim included items such as menu review, selection of dishes and silverware, and "other non-improvement aspects of Tahoe Junction." The thrust of Fondren's contention is that since King cannot apportion between the arguably lienable and the clearly non-lienable activities, his claim must fail. This argument also lacks merit.

A minor error in a lien claim does not invalidate the lien. In Hayes v. Pigg, 515 P.2d 924 (Or. 1973), the Oregon court held:

If the non-lienable charge is extremely small as compared to

the total item in which it is included, and if it is inserted without malicious intent, the rule of *de minimum non curat lex* should apply. No one is perfect and small errors are bound to exist in any lien filed upon a construction project of any considerable size. It is not realistic to become so technical that such errors defeat an otherwise valid lien for a large amount.

*Id.* at 927.

The record shows that RASA paid King in full for the services he rendered on May 23 and 24, 1983, which included some of the non-lienable services itemized by Fondren. Additionally, the services provided by King on July 7, 1983, which included reviewing the menu, amounted to only three hours of work. Since the allegedly non-lienable services rendered by King, if any, appear to be *de minimus,* Fondren's argument must fail.

Therefore, in conclusion, we sustain the trial court's foreclosure of mechanics' liens as to claims made by King and Toledo. However, we reverse the judgment declaring that the equipment sold by Excalibur constituted fixtures and was subject to a mechanics' lien.