LEASEPARTNERS CORPORATION, a California Corporation, and AD ART SIGNS, INC., Appellants, *v.* THE ROBERT L. BROOKS TRUST DATED NOVEMBER 12, 1975, Respondent.

No. 25946

July 15, 1997                                    942 P.2d 182

---

*Kummer, Kaempfer, Bonner & Renshaw* and *Anthony A. Zmaila,* Las Vegas, for Appellant LeasePartners.

*Freeman, Roskelley & Ritchie,* Las Vegas, for Appellant Ad Art Signs, Inc.

*Lionel Sawyer & Collins,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

Appellant LeasePartners Corporation (LeasePartners) financed a long-term equipment lease for Danzig Corporation (Danzig Corp.), the tenant of the Royal Hotel and Casino (Royal Hotel). The Royal Hotel was owned by respondent Robert L. Brooks Trust (the Brooks Trust). After the Danzig Corp. defaulted on its lease with the Brooks Trust, its hotel lease was terminated and neither Danzig Corp. nor the Brooks Trust made any payments to LeasePartners for the signs. LeasePartners filed a complaint against the Brooks Trust, Danzig Corp., and Danzig Corp.'s president, Harold Danzig (Harold), for delivery, misrepresentation, and unjust enrichment. The complaint against the Brooks Trust is the only action at issue in this appeal.

The Brooks Trust moved for and was granted summary judgment against LeasePartners on the grounds that the signs were fixtures and that the Brooks Trust was not unjustly enriched. We conclude that the district court erred in granting summary judgment, and we now reverse that ruling.

### FACTS

The Brooks Trust owns the Royal Hotel in Las Vegas. On August 6, 1989, the Brooks Trust leased the Royal Hotel to Danzig Corp. for a term of twenty-five years with an option for an additional twenty years. Harold determined that the old signage in front of the hotel needed to be replaced because he felt "[i]t wasn't bright enough."

On May 14, 1990, Danzig Corp. and Ad Art Signs, Inc. (Ad Art) entered into an equipment lease which provided for the construction, lease, installation, and maintenance of the new signage. The signage was designed, engineered, and manufactured by Ad Art in Stockton, California. Testimony was presented by Ad Art employees that the signage was custom built to match the design and layout of the Royal Hotel and was custom fit for the Royal Hotel. However, testimony was also presented that portions of the signage could be used elsewhere. For example, testimony indicated that the electronic message center, which accounted for over fifty percent of the cost of the sign, could be

removed and used in other signs. Additionally, the chairman of the board of Ad Art testified by affidavit that all of the signage could be removed without damage to the building, that with the exception of the word "Royal," most of the signage was reusable, and that the signage was modular and could be recreated in different lengths in different locations.

Ad Art removed the old signage from the property over a three-day period and threw it away. Ad Art knew that the Brooks Trust owned the Royal Hotel but did not ask it for permission to dispose of the signs because the Brooks Trust was not its customer. Installing the new signage took approximately two and one-half months. The value of the new signage was in excess of $800,000.

LeasePartners claims that:

> Brooks Trust did not object in any manner to the construction and installation of the New Hotel Signage. Brooks Trust remained silent in circumstances which would lead any reasonable person knowledgeable of commercial practice to believe that a contractor or financier would claim a security interest in the New Hotel Signage.

Mrs. Brooks, the co-trustee of the Brooks Trust, testified that she never discussed the remodeling of the old signage with Harold or granted permission to remove the old signage. Although Harold signed a variance application for the new signage, Mrs. Brooks testified that she was not aware of the application. Earlier, in January 1990, Mrs. Brooks had signed an architectural supervision application for one sign utilizing an electronic message board.

The new signs were installed between April and June of 1990. Under the terms of the May 14, 1990 equipment lease, Ad Art leased the signage to Danzig Corp. for ten years. Additionally, the lease included the following provisions:

6. **TITLE TO EQUIPMENT.** Ownership of the equipment shall at all time remain in Lessor [Ad Art]. The equipment is and shall remain personal property whether or not affixed to realty. . . .

. . . .

25. **GENERAL PROVISIONS:** . . . This agreement is, and is intended to be a lease and Lessee does not acquire hereby any right, title or interest whatsoever, legal or equitable, in or to any of the equipment, or to the proceeds of the sale of any equipment, except its interest as Lessee hereunder.

However, this language conflicts with Paragraph 7.3 of the lease between the Brooks Trust and Danzig Corp. which provided that upon termination of the lease all

additions, improvements, fixtures, furnishings and equipment which may be made or installed or placed by either Lessor or Lessee upon the Leased Property during the term of this Lease . . . shall be surrendered with the Leased Property as a part thereof.

Ad Art initially agreed to finance the construction, installation, and maintenance of the signage. However, Ad Art and Danzig Corp. agreed to seek an alternative method to finance the deal because, apparently, Ad Art either was not in a position to provide long-term financing from its own resources or did not wish to provide long-term financing. LeasePartners, a California company which finances leases, was contacted to provide long-term financing for the project.

On September 25, 1990, LeasePartners paid for and formally acquired Ad Art's rights pursuant to Ad Art's equipment lease agreement with Danzig Corp. and then entered into a new lease with Danzig Corp. The lease provided a monthly payment schedule and further provided that Danzig Corp. could purchase the signage at the end of the lease term for one dollar. Harold personally guaranteed the lease payments, providing financial statements which showed a net worth in excess of $30,000,000. The lease between Danzig Corp. and LeasePartners provided:

> **13. Title: Personal Property:** The Equipment is, and shall at all times remain, property of Lessor, and Lessee shall have no right, title or interest therein or thereto except as expressly set forth in this Lease. . . . The Equipment is and shall at all times and [sic] remain personal property notwithstanding that the Equipment or any part thereof may now be or hereafter become in any manner affixed or attached to real property or any improvements thereof.

This language also conflicts with Paragraph 7.3 of the lease agreement between Brooks Trust and Danzig Corp.

On January 17, 1991, almost four months later, a UCC financing statement purporting to assign Ad Art's security interest to LeasePartners was filed in the office of the Secretary of State. However, the collateral was assigned to Swiss Bank Corporation, not LeasePartners, because LeasePartners financed its Danzig Corp. lease through Swiss Bank Corporation. LeasePartners, however, was listed to receive a copy of the filed financing statement.

Danzig Corp. defaulted on the lease with the Brooks Trust by not paying rent for the months of February, March, April, and May of 1991. Due to this default, the Brooks Trust terminated Danzig Corp.'s lease of the Royal Hotel on May 24, 1991. Until Danzig Corp.'s default and the subsequent termination of the lease, LeasePartners did not know that Danzig Corp. was only a

tenant at the Royal Hotel and that the Brooks Trust owned the Royal.

Following the default, the Brooks Trust refused to release the signs or pay LeasePartners for them. On July 16, 1991, Lease-Partners filed a complaint against Danzig Corp. for breach of contract and claim and delivery and filed a complaint against Harold personally for breach of guaranty and misrepresentation. However, the actions against Harold and Danzig Corp. are not involved in this appeal, and at the time the briefs were filed, these two actions were pending in district court. LeasePartners also filed a complaint against the Brooks Trust for claim and delivery and unjust enrichment, which is the subject of this appeal.

On July 22, 1991, LeasePartners filed an application for an order to show cause why the property should not be taken from Brooks Trust and delivered to LeasePartners. On September 5, 1991, the matter was argued before a district judge who denied the application, concluding as a matter of law that the signs were fixtures and that LeasePartners had no security interest in the signs because it did not file its January 17, 1991 financing statement as a fixture filing. On March 4, 1994, the Brooks Trust filed a motion seeking summary judgment on the grounds that (1) it was not unjustly enriched, and (2) that the signs were fixtures and therefore LeasePartners had no perfected security interest in the signs. On March 21, 1994, LeasePartners filed an opposition to the Brooks Trust's motion for summary judgment and also filed a cross-motion for summary judgment on a claim of unjust enrichment. The district court granted summary judgment in favor of the Brooks Trust and denied LeasePartners' motion in full.

On June 10, 1994, LeasePartners appealed the district court's grant of summary judgment.

## DISCUSSION

Summary judgment is only appropriate when, after a review of the record viewed in a light most favorable to the non-moving party, there remain no issues of material fact. Butler v. Bogdanovich, 101 Nev. 449, 451, 705 P.2d 662, 663 (1985). "In determining whether summary judgment is proper, the nonmoving party is entitled to have the evidence and all reasonable inferences accepted as true." Wiltsie v. Baby Grand Corp., 105 Nev. 291, 292, 774 P.2d 432, 433 (1989).

This court's review of a summary judgment order is de novo. Tore, Ltd. v. Church, 105 Nev. 183, 185, 772 P.2d 1281, 1282

(1989). On appeal, this court is "required to determine whether the trial court erred in concluding that an absence of genuine issues of material fact justified its granting of summary judgment." Bird v. Casa Royale West, 97 Nev. 67, 68, 624 P.2d 17, 18 (1981).

*The district court erred by concluding that the signs were fixtures as a matter of law*

The issue of whether the signs were fixtures or personal property was debated throughout the proceedings in the lower court. At the September 5, 1991 hearing and again in granting the Brooks Trust's motion for summary judgment, the district judge determined as a matter of law that the signs were fixtures; however, we conclude that the district judge's determination was erroneous.

This court has stated that the three factors to determine whether an item is a fixture are annexation, adaptation, and most importantly, intent. Fondren v. K/L Complex, Ltd., 106 Nev. 705, 710, 800 P.2d 719, 722 (1990). We also stated:

> The annexation test is met where the chattel is actually or constructively joined to the real property.
>
> The adaptation test is met when the object in question is adapted to the use to which the real property is devoted. However, the most important factor in making the determination of whether an item is a fixture . . . is the intention of the parties at the time the items were installed.

*Id.* (citations omitted).

The characterization of an item as a fixture or as personal property is a mixed question of law and fact. Rayl v. Shull Enterprises, Inc., 700 P.2d 567, 570 (Idaho 1984); State Highway Com'n v. Empire Building Material Co., 523 P.2d 584, 589 (Or. Ct. App. 1974). However, the application of the three-part test delineated in *Fondren* becomes a pure question of law when only one reasonable conclusion may be drawn from the evidence. *Id.* We conclude that these facts did not present a situation where the three-part *Fondren* test became a pure question of law which could have been decided by a district judge pursuant to a motion for summary judgment.

On the issue of annexation, Brooks Trust argued that the signs were attached to the realty such that they became fixtures. Lease-Partners, however, presented evidence that the signs, while attached to the realty, could be removed without damaging the

building. We conclude that the evidence strongly indicated that the signage was firmly secured to the realty and the hotel, and therefore the only reasonable conclusion that could have been drawn from the evidence was that the signage was annexed to the structure.

The second issue was whether the signage was adapted to the use to which the real property was devoted. Brooks Trust argued that the signage was specially designed and engineered for the Royal and that the electric lighting was designed to advertise the Royal. However, LeasePartners argued that the electronic message center could be removed and used in any sign, that the sign was modular and could be reused and recreated at any other location, and that the only unusable part of the sign was the word "Royal." This conflicting evidence allowed more than one reasonable conclusion to be drawn as to whether the signage was adapted to the use to which the real property was devoted.

Finally, and most importantly, we reach the issue of intent of the parties. At the time the equipment lease agreement was entered into between Ad Art and Danzig Corp., and also at the time LeasePartners acquired Ad Art's interest and entered into a new lease with Danzig Corp., the intention of Ad Art, LeasePartners, and Danzig Corp. was that the signs would remain personal property. Brooks Trust argued, however, that it had a separate lease agreement with Danzig Corp. which designated that everything, including all personal property except for gaming equipment, would be "surrendered with the Leased Property as a part thereof," and that they were neither a party to nor bound by the Ad Art/Danzig Corp. or LeasePartners/Danzig Corp. contracts.

It appears that there may be a conflict between the contract between Brooks Trust and Danzig Corp. and the contract between LeasePartners and Danzig Corp. Clearly then, there is more than one reasonable conclusion that can be drawn from the evidence as to the parties' intentions regarding the characterization of the signs at the time of installation.

Therefore, this is not a situation where the district court could have concluded as a matter of law that the signage was personal property or a fixture because (1) conflicting evidence existed regarding the adaptation issue, (2) the annexation issue favored Brooks Trust, and (3) the property at issue was characterized differently in the agreements Danzig Corp. executed.

Because we have concluded that the district court erred in determining as a matter of law that the signs were fixtures, we need not reach the issue of whether LeasePartners had a superior, perfected security interest in the signs. Such a determination can

only be made after a trier of fact determines whether the signs were personal property or fixtures.[1]

*The district court erred in concluding as a matter of law that the Brooks Trust was not unjustly enriched*

Additionally, we conclude that the district court's conclusion that the Brooks Trust was not unjustly enriched as a matter of law was also erroneous. LeasePartners' motion claimed that the Brooks Trust was unjustly enriched by virtue of the fact that it received and did not pay for several new signs valued at approximately $800,000. Brooks Trust argued that an action for unjust enrichment was improper because a written contract existed and because it was not unjustly enriched.

"The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor." 66 Am. Jur. 2d *Restitution* § 3 (1973).

This court has stated:

> "The essential elements of quasi contract are a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof."

Unionamerica Mtg. v. McDonald, 97 Nev. 210, 212, 626 P.2d 1272, 1273 (1981) (quoting Dass v. Epplen, 424 P.2d 779, 780 (Colo. 1967)). Additionally, unjust enrichment occurs "when ever [sic] a person has and retains a benefit which in equity and good conscience belongs to another." *Unionamerica Mtg.*, 97 Nev. at 212, 626 P.2d at 1273.

An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement. 66

---

[1] If the trier of fact concludes that the signs are personal property, it must then determine whether LeasePartners satisfied NRS 104.9401(1)(c) such that LeasePartners obtained a perfected security interest in the signs. If the trier of fact concludes that the signs are fixtures, it must determine whether LeasePartners satisfied NRS 104.9401(2) or NRS 104.9313(5) such that LeasePartners obtained a perfected security interest in the fixtures. We note that these are only some of the factors which the trier of fact must consider and that other statutes may have relevance in these determinations.

Am. Jur. 2d *Restitution* § 6 (1973). "The doctrine of unjust enrichment or recovery in quasi contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another [or should pay for]." 66 Am. Jur. 2d *Restitution* § 11 (1973); *see* Lipshie v. Tracy Investment Co., 93 Nev. 370, 379, 566 P.2d 819, 824 (1977) ("To permit recovery by quasi-contract where a written agreement exists would constitute a subversion of contractual principles.").

In the instant case, a written contract existed between Brooks Trust and Danzig Corp., and a written contract existed between LeasePartners and Danzig Corp. However, no written contract existed between LeasePartners and Brooks Trust. Therefore, we conclude that there was no "written agreement" as contemplated by either *Lipshie* or 66 Am. Jur. 2d *Restitution* § 11, and a claim for restitution (and unjust enrichment) was not barred on this ground.

The issue therefore becomes whether Brooks Trust was unjustly enriched. LeasePartners argues that through the installment of the signage, it conferred a benefit upon Brooks Trust which Brooks Trust has retained without payment. LeasePartners argues that it conferred a benefit upon Brooks Trust because the new signs were bigger, more attractive, and more state of the art than the old signs which they replaced. However, Brooks Trust was apparently satisfied with the old signs which were destroyed and therefore argues that any benefit conferred upon it, if indeed there was any, was unwanted.

We conclude that this conflicting evidence regarding whether or not a benefit was conferred upon the Brooks Trust created a genuine issue of material fact, and that the district court erred in granting summary judgment in favor of Brooks Trust on this issue but was correct in denying LeasePartners' motion on the same. Therefore, this issue must be remanded to the district court for the trier of fact to determine whether Brooks Trust was unjustly enriched, and if so, to what extent.

## CONCLUSION

The district court erred in concluding as a matter of law that the signs were fixtures because genuine issues of material fact remained regarding that issue. Additionally, the district court erred in granting summary judgment in favor of Brooks Trust on the issue of whether Brooks Trust was unjustly enriched because genuine issues of material fact remained regarding that issue.

For the foregoing reasons, we reverse and remand this case to the district court for proceedings consistent with this opinion.[2]

SHEARING, C. J., ROSE, J., ZENOFF, SR. J., and AMES, D. J., concur.

---

[2]THE HONORABLE DAVID ZENOFF, Senior Justice, was appointed to sit in place of THE HONORABLE THOMAS L. STEFFEN, then Chief Justice. Nev. Const. art. 6, § 19; SCR 10.

The Honorable Jack B. Ames, Judge of the Fourth Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE CLIFF YOUNG, Justice. Nev. Const. art. 6, § 4.

THE HONORABLE CHARLES E. SPRINGER, Justice, voluntarily recused himself from participation in the decision of this appeal.

THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this appeal.