COVINGTON BROTHERS, a California Corporation, Appellant, *v.* VALLEY PLASTERING, INC., a Nevada Corporation, Respondent.

No. 8519

July 1, 1977                                   566 P.2d 814

*Jones, Jones, Bell, LeBaron & Close,* Las Vegas, for Appellant.

*John Peter Lee,* Las Vegas, for Respondent.

# OPINION

By the Court, MOWBRAY, J.:

Valley Plastering, Inc., the respondent, commenced this action against Covington Brothers, the appellant, seeking (1) foreclosure of a mechanic's lien and (2) damages for breach of contract. Both causes of action arose out of a housing construction project in Las Vegas. The district judge ruled in favor of Valley, ordering foreclosure of the lien in the amount of $3,858.10 and awarding $20,000 damages for breach of contract.

The issues presented are whether the court erred in its findings that Valley was entitled to recover $3,858.10 under its mechanic's lien and that Covington had breached its contract with Valley. If Covington did breach its contract, then we must determine whether the $20,000 damage award was proper.

1. *The Facts.*

Covington, as owner and general contractor for a housing project called El Sol Del Pueblo, entered into a written contract with Valley to "[f]urnish all necessary labor, equipment and materials for [a] complete exterior plaster (stucco) job," covering 48 four-plex buildings. The construction consisted of

two phases: the first included 22 units, and the second, 26 units.

Covington agreed to pay Valley $62,106 upon completion of the first phase, and $73,398 when the second phase was completed.

A dispute arose soon after work started regarding who had the responsibility of applying the lath backing for the stone veneer on the buildings. Rather than delay the construction, Mr. Bryan, project superintendent for Covington, told Mr. Friel, president of Valley, to go ahead and do the work. The testimony is conflicting, however, whether Bryan unconditionally promised Friel payment for the additional work or whether he promised payment only if Covington's main office should determine that the work was not within the scope of the contract.

Before commencement of the second phase of the project, Covington sent letters to all its subcontractors, including Valley, asking for a written assurance of their intent to perform phase 2. Valley did not comply with Covington's request. The testimony is in conflict whether oral assurances were given. Valley stated they were given. Covington claimed, however, that Valley had previously expressed an unwillingness to go forward unless the contract price for phase 2 was increased. Covington later notified Valley that it had selected another subcontractor. This lawsuit resulted.

2. *The Issues.*

Covington urges that Valley should not be awarded $3,858.10 for applying the lath backing for the stone veneer. Covington presented evidence indicating that plaster subcontractors customarily did lathing work and urged that the terms of the contract indicated that the work was included in the contract price.

The terms of the contract are ambiguous. While the contract specifies "all lath and plaster required for a complete job," it also refers to work required for a complete *stucco* exterior. No reference is made to portions of the exterior that were brick or stone. Valley offered evidence that it did not consider the work within the scope of the contract and that it did the work only because of Covington's expressed assurance of additional payment.[1] The court found for Valley, and the finding is supported by substantial evidence. It may not be disturbed on

---

[1] From transcript of June 1975 trial:

Q [by John Peter Lee, Esq.] What was said by you, and what was said by Mr. Bryan about the extras?

A [by Mr. Friel] Well, I asked—I told Bill [Bryan] that it wasn't

appeal. Shell Oil Co. v. Ed Hoppe Realty Inc., 91 Nev. 576, 540 P.2d 107 (1975).

Covington suggests that it did not breach its contract by awarding phase 2 to another subcontractor, because Valley had already committed an anticipatory repudiation of its contractual obligations. The record shows that Covington sent registered form letters to all phase 1 subcontractors, requesting written assurance that they were ready and willing to perform phase 2. It is undisputed that Valley received such a letter and failed to provide a written response.

The testimony is conflicting whether Valley gave oral assurance of performance. The uncertainty arose from the fact that a price increase for phase 2 was discussed. Valley admits requesting an increase, but denies having conditioned further performance on its being granted.[2] On March 25, 1974, Covington informed Valley by letter that it had selected another subcontractor to perform, and on April 2, 1974, engaged Southwest Construction Co. for that purpose. Valley, in return, by certified letter dated April 3, 1974, advised Covington that it was willing to perform phase 2. That letter stated, in part:

> Mr. Friel, president of Valley Plastering, Inc., informed your representative, William Bryan, that his firm did intend to proceed with Phase Two, but demanded payment in full of all the monies due under Phase One. Therefore, the statements made by you in your March 25,

---

on the plans or the contract for me to supply the backing for the block veneer, that my job was only to do the exterior lathing and plastering on the exterior walls which were supposed to be stucco.

Q And what was Mr. Bryan's response to that?

A Well, he said that for me to go ahead and do it so I wouldn't delay the job, and we would get it ironed out, and that he would take the money off the block layer and pay me for it as soon as they could have a meeting.

[2]*Id.*:

Q Did you have any further discussion with anyone from Covington about doing it [phase 2] or not doing it after you received Exhibit 12 [Covington's letter of Feb. 8, 1974, to all subcontractors re phase 2]?

A Yes. I talked with Bill Bryan.

Q When was that new, Mr. Friel?

A It would have been towards the end of February. I talked to him about it. I asked him if on unit—on phase two if we would be able to get any more money, and he says, "No." He asked me if I was planning on continuing and doing phase two. At that time I says, "Yes, because I have a contract that I'm obligated to fill with no increase." I said, "I plan on filling it."

Q When was that, Mr. Friel?

A That was toward the end of February.

1974 letter are incorrect. Valley Plastering, Inc., does intend to do Phase Two but must insist on payment in full of the monies now due under Phase One, to-wit: the sum of $3,858.10.

We have been informed that you intend to use others to do work that Valley Plastering, Inc., contracted to do. If this occurs, then we intend to proceed against your firm for the damages suffered by Valley Plastering, Inc., in the amount of the profit which they would otherwise have realized had they been allowed to proceed with the second phase in the sum of $20,000.00.

Your prompt attention to these matters is encouraged and we will expect payment forthwith of the balance due under the old contract so that we may proceed to perform the second phase immediately.

A contractual anticipatory repudiation must be clear, positive, and unequivocal. *See* Kahle v. Kostiner, 85 Nev. 355, 455 P.2d 42 (1969). Whether specific conduct or language is sufficiently clear to constitute an anticipatory repudiation must be decided in light of the total factual context of the individual case. *See* Early v. Santa Clara Broadcasting Co., 27 Cal.Rptr. 212, 214 (Cal.App. 1963).

The court in this case chose to believe Valley's version of the facts and in so doing found that an anticipatory repudiation did not occur. Such a finding was within the court's discretion. Substantial evidence supports the finding, and it therefore must stand. Shell Oil Co. v. Ed Hoppe Realty Inc., 91 Nev. 576, 540 P.2d 107 (1975).

Finally, Covington contends that the court erred in awarding Valley a gross profit lost on phase 2 of the contract. It is urged that, in addition to the cost of labor and material, the court should have deducted some portion of the company's overhead: i.e., the officers' salaries, depreciation, interest, office rent.

Covington cites four cases from neighboring jurisdictions to support its contention that the proper measure of damages for a breach of contract is net, not gross, profit. The issue has not yet been decided by this court.[3] The four cases that Covington

---

[3]The two Nevada cases cited hold only that the nonbreaching party is entitled to the total contract price less cost of performing. *See* Fuller v. United Elec. Co., 70 Nev. 448, 273 P.2d 136 (1954); Bradley v.

relies upon are: Perfecting Serv. Co. v. Product Dev. & Sales Co., 131 S.E.2d 9 (N.C. 1963); Gerwin v. Southeastern Cal. Ass'n of Seventh Day Adv., 92 Cal.Rptr. 111 (Cal.App. 1971); West Coast Winery, Inc. v. Golden West Wineries, 158 P.2d 623 (Cal.App. 1945); and Lee v. Durango Music, 355 P.2d 1083 (Colo. 1960).

In *Perfecting Serv. Co.,* the court held that the measure of damages for breach of a contract to manufacture and deliver a patented mechanical device for automobiles was the contract price less the cost of performance, that cost to include overhead charges. This holding is limited to contracts dealing with the supply of goods manufactured in volume, where overhead can be accurately allocated as a per-unit cost.

> In cases, such as the one at bar, where the seller has an established and going business and is manufacturing and selling goods to various buyers, overhead and fixed charges constitute elements of cost of manufacture and are the subject of proper inquiry, and they are susceptible of approximate ascertainment.

*Id.* at 22. What portion of Valley's overhead should be apportioned to the project concerned herein cannot be determined with the same accuracy. Moreover, to make such a deduction when a contractor is prevented from performing a contract is contrary to the underlying purpose of an award of damages.

The other three cases cited are distinguishable on another basis. *Lee* concerned an action by a tenant against a landlord for breach of a lease. Tenants sought profits lost from operation of a music store as a result of being excluded from part of the leased premises. An award of net profits rather than gross is proper where overhead has been reduced as a result of the breach, which caused an interruption or reduction in business operations. No reduction was shown in the instant case, nor is one necessarily inferred from the facts presented.

Covington cites two California cases in further support of its argument. *West Coast Winery, Inc.* is distinguishable as involving a sale-of-goods contract. In that case, however, overhead charges required to be deducted were those which were saved by virtue of the breach:

> Here, to allow plaintiff to recover the retail sale price of

Nevada-California-Oregon Ry., 42 Nev. 411, 178 P. 906 (1919). That the cost of performing includes company overhead is supported only by appellant's own assertion.

the wine would be to put it in a better position than it would have been in if defendant had returned the wine according to the exchange agreement. . . . It would then have been necessary for plaintiff in order to sell it at retail to provide bottles or other containers. . . . The labor necessary to bottle or otherwise package this quantity of wine for retail sale would also be an important item.

*Id.* at 625–626.

In *Gerwin,* plaintiff sued for breach of a contract to supply restaurant and bar equipment for a proposed business. Plaintiff was unable to secure substitute equipment, and the business never went into operation. In that case, it would have been error to award gross profits lost, compensating plaintiff for overhead charges never incurred. In fact, the court denied any recovery for lost profits as not having been proved with reasonable certainty.

Where overhead expenses are saved as a result of a breach of contract, the proper measure of recovery is net, not gross, profit. Where such expenses are constant, however, and no saving occurs, the rule is otherwise. In Automatic Vending Co. v. Wisdom, 6 Cal.Rptr. 31, 33–34 (Cal.App. 1960), the court stated:

[T]he testimony shows that the respondent's costs of doing business were fixed and would not diminish because of the loss of the right to place one of its cigarette vending machines in appellant's cafe. While the general rule is that one will not be permitted to recover gross profits . . . in such a situation, the gross profits involved would also constitute the net profits which the plaintiff would have earned under the agreement.

*Accord,* Dallman Co. v. Southern Heater Co., 68 Cal.Rptr. 873 (Cal.App. 1968). *See also* Distillers Distrib. Corp. v. J. C. Millett Co., 310 F.2d 162 (9th Cir. 1962); Resolute Ins. Co. v. Percy Jones, Inc., 198 F.2d 309 (10th Cir. 1952); McCollum v. O'Neil, 281 P.2d 493 (Mont. 1954).

Covington urges that this rule places Valley in a superior position. This argument misconstrues the purpose of the computation of damages in the event of a breach. Had Valley never been awarded the plastering contract, it would have been required to bear approximately the same overhead charges. Admittedly, the award of gross profit puts Valley in a position

superior to that held before the contract was secured. However, it is not this prior position the court seeks to approximate but, rather, Valley's position had the contract been performed.

While it is possible that some portion of Valley's overhead was saved by virtue of the breach and that this saving should have been considered in computing the damage award, Covington offered no evidence to establish the fact or the amount of the savings. This court has held, in Cladianos v. Friedhoff, 69 Nev. 41, 240 P.2d 208 (1952), that where no showing is made as to the cost of performing the remainder of a contract, it will be presumed that there was no cost.

Covington also contends that the alleged damages were too speculative to support an award, but offers no authority to support this contention, which is totally without merit. Future profits are not per se speculative and, when based on a fixed contract, would rarely be held as such. Furthermore, in this case Valley had a particularly reliable basis for computing its damages, having already completed a nearly identical portion of the contract.

In summary, we conclude that conflicting evidence was presented whether Valley was promised payment above the contract price for certain lathing work and whether Valley was guilty of an anticipatory repudiation of its contract with Covington  The court, as the trier of fact, found in favor of Valley on both issues, and its decision, supported by the record, may not be disturbed on appeal.

Neither did the court err in awarding gross, rather than net, profit as the measure of damages, since no proof was presented that the breach in any way reduced Valley's overhead expenses. The purpose of an award of damages is to put the nonbreaching party in as good a position as if the contract had been performed. Where that party's overhead remains constant notwithstanding the breach, an award of net profit would put the party only where it would have been had the contract never been secured.

The judgment is affirmed.[4]

BATJER, C. J., and ZENOFF, THOMPSON, and GUNDERSON, JJ.; concur.

---

[4]Pursuant to the authority delineated in the Nevada Constitution, art. 6, § 19, the Chief Justice recalled the HONORABLE DAVID ZENOFF, a retired Justice of this court, to participate in this case.