139 Nev., Advance Opinion 22

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| VALLEY HEALTH SYSTEM, LLC, A NEVADA LIMITED LIABILITY CORPORATION, D/B/A CENTENNIAL HILLS HOSPITAL MEDICAL CENTER, Appellant, vs. DWAYNE ANTHONY MURRAY, INDIVIDUALLY, AS AN HEIR, AS A GUARDIAN AND NATURAL PARENT OF BROOKLYN LYSANDRA MURRAY, AND AS SPECIAL ADMINISTRATOR OF THE ESTATE OF LAQUINTA ROSETTE WHITLEY-MURRAY, DECEASED, Respondent. | No. 79658 |

**FILED**

AUG 17 2023

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

| | |
|---|---|
| VALLEY HEALTH SYSTEM, LLC, A NEVADA LIMITED LIABILITY CORPORATION, D/B/A CENTENNIAL HILLS HOSPITAL MEDICAL CENTER, Appellant, vs. DWAYNE ANTHONY MURRAY, INDIVIDUALLY, AS AN HEIR, AS GUARDIAN AND NATURAL PARENT OF BROOKLYN LYSANDRA MURRAY, AND AS SPECIAL ADMINISTRATOR OF THE ESTATE OF LAQUINTA ROSETTE WHITLEY-MURRAY, DECEASED, Respondent. | No. 80113 |

23-26860

VALLEY HEALTH SYSTEM, LLC, A
NEVADA LIMITED LIABILITY
CORPORATION, D/B/A CENTENNIAL
HILLS HOSPITAL MEDICAL CENTER,
Appellant,
vs.
DWAYNE ANTHONY MURRAY,
INDIVIDUALLY, AS AN HEIR, AS
GUARDIAN AND NATURAL PARENT
OF BROOKLYN LYSANDRA MURRAY,
AND AS SPECIAL ADMINISTRATOR
OF THE ESTATE OF LAQUINTA
ROSETTE WHITLEY-MURRAY,
DECEASED,
Respondent.

Objection to senior justice assignments and motion to designate replacements for disqualified justices in accordance with the Nevada Constitution, article 6, section 4(2).

*Objection overruled; motion denied.*

Pisanelli Bice PLLC and Jordan T. Smith, Las Vegas; Greenberg Traurig, LLP, and Kendyl Hanks, Austin, Texas,
for Appellant.

Lewis Roca Rothgerber Christie LLP and Daniel F. Polsenberg and Abraham G. Smith, Las Vegas; The Gage Law Firm, PLLC, and David O. Creasy, Las Vegas,
for Respondent.




BEFORE THE SUPREME COURT, EN BANC.[1]

*OPINION*[2]

By the Court, STIGLICH, C.J.:

In 1976, the people of Nevada amended our state constitution to provide for the recall to active service of any consenting retired state court justice or judge not removed or retired for cause or defeated for retention of office. Under that amendment, article 6, section 19(1)(c), the chief justice "may assign [the recalled senior justice or judge] to appropriate temporary duty within the court system," and over the 45 years since the amendment's effective date, successive chief justices have regularly assigned such senior justices to temporary duty in supreme court cases when a sitting justice is disqualified. Appellant now claims that pursuant to article 6, section 4(2) of the constitution, only the governor has authority to temporarily replace a disqualified justice on the supreme court. We are unable to read either provision so restrictively, however, and conclude that, under the Nevada Constitution, both the governor and the chief justice may designate temporary substitutes for disqualified justices on the supreme court.

---

[1]The Honorable Elissa F. Cadish and the Honorable Patricia Lee, Justices, being disqualified, did not participate in the resolution of this objection and motion. The Honorable Michael Cherry and the Honorable Abbi Silver, Senior Justices, who were assigned on March 30, 2023, to hear oral argument and participate in the determination of these consolidated appeals in the disqualified justices' places, also did not participate in the resolution of this objection and motion.

[2]We entered an order denying the motion to designate justices in this matter on April 17, 2023, indicating that this opinion would follow.

*BACKGROUND*

In these consolidated appeals, appellant Valley Health System, LLC, doing business as Centennial Hills Hospital Medical Center, challenges a $48.6 million wrongful death judgment, as well as several post-judgment orders, resulting from a jury verdict finding that, in relation to a deceased patient, Centennial Hills had both breached the standard of care applied to medical providers and intentionally breached a fiduciary duty owed to the patient. The appeals raise important issues of first impression in Nevada and thus are assigned to the en banc court for decision. Justices Elissa F. Cadish and Patricia Lee, however, are disqualified from participating in that decision. As a result, before oral argument was heard and the appeals' merits decided, the chief justice entered orders assigning Senior Justices Michael Cherry and Abbi Silver to participate in the disqualified justices' places.

Centennial Hills objected to the senior justice assignments and moved to designate replacement justices in accordance with the Nevada Constitution, article 6, section 4(2), which authorizes the governor to designate court of appeals or district judges to sit in the place of disqualified or disabled supreme court justices.[3] According to Centennial Hills, section 4(2) bestows upon the governor sole authority to designate substitute justices in cases of disqualification, and those substitutes must be sitting lower court judges. Moreover, Centennial Hills argues, as a specific provision addressing disqualification, section 4(2) trumps the more general authority of the chief justice under section 19(1) to recall senior justices and assign them to temporary duty when sitting justices are disqualified. It

---

[3]Oral argument was vacated upon the filing of Centennial Hills' emergency objection and motion.

 

thus asks that the senior justice assignments be vacated, and that the governor designate two substitute judges to participate in place of the disqualified justices.

Respondent Dwayne Anthony Murray, as heir, parent to the patient's child, and estate representative, filed a response to the objection and motion, arguing that the chief justice's authority to temporarily assign senior justices under section 19(1) is "concurrent, complementary, and compatible" with the governor's authority under section 4(2), such that we should overrule the objection and deny the motion. Specifically, Murray asserts that section 19(1) merely extends the chief justice's general and broad authority to substitute a sitting justice for a disqualified justice by including senior justices as available substitutes, while section 4(2) gives the governor a limited power over judicial assignments that the chief justice does not otherwise hold—that of elevating lower court judges to temporary assignment in the supreme court—a power that is not inherent to the executive branch under Nevada's separation-of-powers doctrine.

After reviewing the parties' arguments in light of the constitution's plain language and contemporaneous understanding of each provision, we conclude that the senior justice assignments were constitutionally permissible and thus overrule the objection and deny the motion to designate replacement justices.

## DISCUSSION

Resolving Centennial Hills' objection and motion requires examination of two provisions of article 6 of the Nevada Constitution: section 4(2) and section 19(1). As noted, section 4(2) addresses the governor's designation of district and court of appeals judges to sit in the places of disqualified or disabled supreme court justices:

> In case of the disability or disqualification, for any cause, of a justice of the Supreme Court, the Governor may designate a judge of the court of appeals or a district judge to sit in the place of the disqualified or disabled justice. The judge designated by the Governor is entitled to receive his actual expense of travel and otherwise while sitting in the Supreme Court.

Under section 4(2), then, the governor may designate lower court judges to temporarily act in supreme court cases but has no power to recall senior justices or judges to temporary service. After the provision's ratification in 1920, the governor routinely designated district judges to replace supreme court justices who were "disqualified," who "disqualified themselves," and who "voluntarily recused" themselves.[4]

Section 19(1), on the other hand, recognizes the chief justice as the administrative head of the court system and provides for the recall and temporary assignment of senior justices, among other things:

> The chief justice is the administrative head of the court system. Subject to such rules as the supreme court may adopt, the chief justice may:
>
> (a) Apportion the work of the supreme court among justices.

---

[4]*E.g.*, *State v. Jepsen*, 46 Nev. 193, 196, 209 P. 501, 502 (1922) (replacing a "disqualified" justice); *Mirin v. State*, 93 Nev. 57, 60 n.1, 560 P.2d 145, 146 n.1 (1977) (replacing a justice who "voluntarily disqualified himself"); *State v. Fitch*, 65 Nev. 668, 693, 200 P.2d 991, 1004 (1948) (replacing a justice who "disqualified himself"), *overruled on other grounds by Graves v. State*, 82 Nev. 137, 413 P.2d 503 (1966); *Schneider v. State*, 97 Nev. 573, 575 n.3, 635 P.2d 304, 305 n.3 (1981) (replacing a justice "who voluntarily recused himself"). *See* Jeffrey T. Fiut, *Recusal and Recompense: Amending New York Recusal Law in Light of the Judicial Pay Raise Controversy*, 57 Buff. L. Rev. 1597, 1598 n.3 (2009) (noting that the terms "recuse" and "disqualify," while varying slightly in meaning, are often used interchangeably).

(b) Assign district judges to assist in other judicial districts or to specialized functions which may be established by law.

(c) Recall to active service any retired justice or judge of the court system who consents to such recall and who has not been removed or retired for cause or defeated for retention in office, and may assign him to appropriate temporary duty within the court system.[5]

By permitting the assignment of senior justices to "appropriate temporary duty within the court system," section 19(1)(c) plainly authorizes the chief justice to temporarily assign senior justices to service in the supreme court. *See* Nev. Const. art. 6, § 1 ("The judicial power of this State is vested in a court system, comprising a Supreme Court, a court of appeals, district courts and justices of the peace."); *We the People Nev. ex rel. Angle v. Miller*, 124 Nev. 874, 881, 192 P.3d 1166, 1170 (2008) (recognizing that, as with statutory interpretation, a constitutional provision's plain language controls).

This authorization has long been understood to include the power to assign senior justices in cases of supreme court disqualification. Pursuant to section 19(1), the supreme court implemented rules governing senior justice assignments without delay. Supreme Court Rule (SCR) 243 was adopted contemporaneously with the amendment's 1977 effective date and provided that the chief justice could assign a senior justice or judge to "any state court at or below the level" served at retirement. SCR 243(1) (effective October 12, 1977). SCR 243 further acknowledged that the

---

[5]Section 19 was ratified by the people in 1976 and became effective on July 1, 1977. Const. Amend. to Be Voted Upon in State of Nev. at Gen. Elec., Nov. 2, 1976, Ballot Question 6.

assigned senior justice or judge would hold "all the judicial powers and duties, while serving under the assignment, of a regularly elected and qualified justice or judge of the court to which he is assigned." SCR 243(4).[6]

---

[6]The provisions of SCR 243 were transferred to SCR 10 in 1979. Today, SCR 10, at subsections 6 and 9, reads similarly: "A senior justice, senior court of appeals judge, or senior district judge, with his or her consent, is eligible for temporary assignment to any state court at or below the level of the court in which he or she was serving at the time of retirement or leaving office . . . . Each senior justice, senior court of appeals judge, or senior district judge assigned as provided in this rule has all the judicial powers and duties, while serving under the assignment, of a regularly elected and qualified justice or judge of the court to which he or she is assigned."

We note that other courts have interpreted analogous language governing chief justice administrative powers similarly. *See generally City of Bessemer v. McClain*, 957 So. 2d 1061, 1091-93 (Ala. 2006) (on second application for rehearing) (recognizing that a 1973 amendment to the Alabama Constitution broadly allowing the chief justice to "assign appellate justices and judges to any appellate court for temporary service" authorized the chief justice's consistent use of the constitutional provision in cases of supreme court disqualification); *Legacy Found. Action Fund v. Citizens Clean Elections Comm'n*, 524 P.3d 1141, 1143 (Ariz. 2023) (replacing a recused justice with a senior justice per Arizona Constitution, article VI, section 3, which states that "[t]he chief justice, or in his absence or incapacity, the vice chief justice, shall exercise the court's administrative supervision over all the courts of the state"); *Commonwealth v. Wetton*, 648 A.2d 524, 526 (Pa. 1994) (recognizing that Pennsylvania Constitution article V, section 16(c), which provides that "[a] former or retired justice or judge may, with his consent, be assigned by the Supreme Court on temporary judicial service as may be prescribed by rule of the Supreme Court," allowed assignment of a senior justice to the Pennsylvania Supreme Court by the chief justice pursuant to court rules generally authorizing assignment to "any court").

Moreover, the chief justice's power to assign senior justices to temporary service was used immediately to obtain substitutes for supreme court justices in cases of disqualification and otherwise, sometimes in conjunction with the governor's power to designate district judges. *See, e.g., Covington Bros. v. Valley Plastering, Inc.*, 93 Nev. 355, 363 n.4, 566 P.2d 814, 819 n.4 (July 1, 1977) (recalling a senior justice to participate in the case under section 19(1)); *Nev. State Apprenticeship Council v. Joint Apprenticeship & Training Comm. for Elec. Indus.*, 94 Nev. 763, 766 n.5, 587 P.2d 1315, 1317 n.5 (1978) (designating senior justice to sit in place of disqualified justice under section 19(1) and SCR 243); *Ressler v. Mahony*, 99 Nev. 352, 353 n.1, 661 P.2d 1294 n.1 (1983) (acting chief justice designating senior justice under section 19(1) and obtaining governor assignment of district judge under section 4(2) as substitutes for voluntarily disqualified justices); *Sacco v. State*, 105 Nev. 844, 849 nn.1 & 2, 784 P.2d 947, 950-51 nn.1 & 2 (1989) (per curiam) (same). Indeed, the chief justice assigned a senior justice to participate in supreme court cases in place of a disqualified justice at least seven times in the first two years following section 19(1)'s adoption,[7] and regularly thereafter.[8]

---

[7] *Nev. State Apprenticeship Council*, 94 Nev. at 766 n.5, 587 P.2d at 1317 n.5; *Hynds Plumbing & Heating Co. v. Clark Cty. Sch. Dist.*, 94 Nev. 776, 779 n.3, 587 P.2d 1331, 1333 n.3 (1978); *Dep't of Motor Vehicles v. Rebol*, 95 Nev. 64, 66 n.4, 589 P.2d 178, 179 n.4 (1979); *Douglas County v. Tahoe Reg'l Planning Agency*, 95 Nev. 101, 102 n.2, 590 P.2d 160, 160 n.2 (1979); *Cooper v. State*, 95 Nev. 114, 115 n.1, 590 P.2d 166, 167 n.1 (1979); *Bradley v. Bradley*, 95 Nev. 201, 201 n.2, 591 P.2d 663, 663 n.2 (1979); *Cranford v. State*, 95 Nev. 471, 474 n.3, 596 P.2d 489, 491 n.3 (1979).

[8] *E.g., Harvey's Wagon Wheel, Inc. v. MacSween*, 96 Nev. 215, 220 n.4, 606 P.2d 1095, 1098 n.4 (1980); *Jacobson v. Best Brands, Inc.*, 97 Nev. 390, 394 n.6, 632 P.2d 1150, 1153 n.6 (1981); *Haromy v. Sawyer*, 98 Nev. 544,

In examining the relationship between section 19(1) and section 4(2), we must read the constitution as a whole, giving effect to and harmonizing each provision. *We the People*, 124 Nev. at 881, 192 P.3d at 1171. If the constitution's language can be interpreted in more than one reasonable way, we look to its history and the constitutional scheme to ascertain what was intended at the time of ratification. *Id.* When exploring Nevadans' historical understanding of the constitution, contemporary construction and legislation is relevant and given great weight. *Strickland v. Waymire*, 126 Nev. 230, 234-35, 235 P.3d 605, 608-09 (2010). This is particularly so when other means of determining the voters' intent is unavailable, as "such [contemporaneous] construction is 'likely reflective of the mindset of the framers.'" *Halverson v. Sec'y of State*, 124 Nev. 484, 489, 186 P.3d 893, 897 (2008) (discussing the Legislature's interpretation of a constitutional provision and quoting *Director of Office of State Lands & Investments v. Merbanco, Inc.*, 70 P.3d 241, 256 (Wyo. 2003) (examining historical aspects of both the legislative and the executive branches'

---

548 n.1, 654 P.2d 1022, 1024 n.1 (1982); *Tompkins v. Buttrum Constr. Co.*, 99 Nev. 142, 146 n.5, 659 P.2d 865, 868 n.5 (1983); *Foley v. City of Reno*, 100 Nev. 307, 309 n.1, 680 P.2d 975, 976 n.1 (1984); *Rust v. Clark Cty. Sch. Dist.*, 103 Nev. 686, 691 n.2, 747 P.2d 1380, 1383 n.2 (1987); *Smith v. Clough*, 106 Nev. 568, 570 n.3, 796 P.2d 592, 594 n.3 (1990); *DeLee v. Roggen*, 111 Nev. 1453, 1459 n.2, 907 P.2d 168, 171 n.2 (1995); *LeasePartners Corp. v. Robert L. Brooks Tr. Dated Nov. 12, 1975*, 113 Nev. 747, 757 n.2, 942 P.2d 182, 188 n.2 (1997); *Staccato v. Valley Hosp.*, 123 Nev. 526, 527 n.1, 170 P.3d 503, 504 n.1 (2007); *Nev. Classified Sch. Emps. Ass'n v. Quaglia*, 124 Nev. 60, 61 n.1, 177 P.3d 509, 510 n.1 (2008); *C.R. Homes, Inc. v. Fifth Judicial Dist. Court*, No. 55151, 2011 WL 4434860, at *2 n.1 (Nev. Sept. 22, 2011) (Order Denying Petition for Writ of Prohibition or Mandamus); *Shores v. Glob. Experience Specialists, Inc.*, 134 Nev. 503, 503 n.1, 422 P.3d 1238, 1239 n.1 (2018); *Cox v. Copperfield*, 138 Nev., Adv. Op. 27, 507 P.3d 1216, 1220 n.1 (2022).

interpretation of and exercise of power under a constitutional provision in discerning its meaning)).

Although Centennial Hills contends otherwise, these two sections do not necessarily conflict. *Cf. Piroozi v. Eighth Judicial Dist. Court*, 131 Nev. 1004, 1009, 363 P.3d 1168, 1172 (2015) (explaining that when a general and specific statute conflict, the specific controls). As originally added in 1920, section 4(2) read, "In case of the disability or disqualification, for any cause, of the chief justice or either of the associate justices of the supreme court, or any two of them, the *governor is authorized and empowered to* designate any district judge or judges to sit in the place or places of such disqualified or disabled justice or justices . . . ."[9] (Emphasis added.) Thus, with respect to supreme court disqualifications, section 4(2) gives the governor limited power to designate lower court judges to participate in disqualified justices' places. But nothing in section 4(2) gives the governor the *sole* power to select substitutes for disqualified justices, and to the extent that section can be read otherwise, the provisions must be harmonized. *We the People*, 124 Nev. at 881, 192 P.3d at 1171.

Section 19(1) provides the chief justice broad power to laterally assign judges and justices but, per SCR 243, does not give the chief justice power to elevate district and court of appeals judges to act in supreme court cases. The constitution thus authorizes both the governor to designate

_____

[9]"Authorized and empowered to" was changed to "may" and court of appeals judges were added in 2014, without public comment and seemingly as a stylistic change and recognition of the new court of appeals, respectively. *See* Nevada Ballot Questions 2014, Nevada Secretary of State, Question No. 1; 2013 Nev. Stat., file no. 47, at 3969; 2011 Nev. Stat., file no. 26, at 3836. In any event, as the concurrence/dissent points out, "may" typically indicates permission, not directive. *Ewing v. Fahey*, 86 Nev. 604, 607, 472 P.2d 347, 349 (1970).

lower court judges for temporary assignment in the supreme court in cases of disqualification and the chief justice to assign senior justices to the supreme court for temporary assignment in cases of disqualification. The powers are complementary. Centennial Hills' interpretation, on the other hand, would restrict the chief justice's power to make senior justice assignments "within the court system," by excluding from purview one of the courts in the system. *See McClain*, 957 So. 2d at 1092 (recognizing that courts cannot interpret provisions of a constitution to restrict their plain meaning or "ignore words in the constitutional scheme"). Because there is no indication from its text, history, or context that section 19(1) means anything less than what it says, and as section 19(1) has since its inception been viewed as allowing senior justice assignments in cases of disqualification, we decline to read such a restriction into the constitution.

Thus, under the constitution, Nevada has two methods for selecting substitutes for disqualified justices: the governor can designate lower court judges, or the chief justice can assign senior justices. These dual methods are expressly recognized in this court's Internal Operating Procedure 1(g)(4), which states that the chief justice can either randomly select a district judge's name to forward to the governor or recall a senior justice for temporary assignment, and as noted *supra*, on occasion both are invoked in the same proceeding. Further, this dual-method system is not completely unique: Tennessee, for instance, also allows both the governor and the chief justice to appoint substitutes. Don R. Willett, *Supreme Stalemates: Chalices, Jack-O'-Lanterns, and Other State High Court Tiebreakers*, 169 U. Pa. L. Rev. 441, 494-95 (2021) (citing *Hooker v. Sundquist*, No. 01A01-9709-CH-00533, 1999 WL 74545, at *3 (Tenn. Feb. 16, 1999) (separate statutes authorizing governor and chief justice to

appoint substitute justices were consistent with constitutional directive and "the traditional practice of this Court," and thus both the governor and the chief justice hold power to designate temporary judges)). As the chief justice's senior justice assignments here were not made in violation of section 4(2), we overrule Centennial Hills' objection, rendering moot its motion for section 4(2) gubernatorial designation of substitute judges.

Having answered the question raised by Centennial Hills' objection and having reached the same conclusion as our concurring/dissenting colleague as to that question, it would seem that this matter is resolved and nothing more need be said. Nevertheless, the dissenting opinion addresses a topic neither raised by the parties nor addressed in resolving the objection and motion—selection methods and timing. As to those issues, we note only that the dissent points to no facts suggesting an untoward selection process in this case (nor, we believe, could it) and that neither IOP 1(g)(2) nor any other provision of which we are aware restricts substitutions when necessary to bring the court to full strength before hearing and determining an appeal en banc, existing quorum or not. While we do not disagree that selection methods and timing may be important to the public trust, they are not in question here and would be better addressed on the administrative docket.

## CONCLUSION

When supreme court justices are disqualified from participating in a case, the Nevada Constitution authorizes both the governor's designation of lower court judges and the chief justice's temporary assignment of senior justices to take the places of the disqualified justices. Accordingly, the chief justice's assignment of senior justices to this case was constitutionally authorized, and Centennial Hills'

SUPREME COURT
OF
NEVADA

(O) 1947A

13

objection is overruled and its motion to designate lower court judges is denied.

_____, C.J.
Stiglich

We concur:

_____, J.
Herndon

_____, J.
Parraguirre

_____, J.
Bell

SUPREME COURT
OF
NEVADA

(O) 1947A

14

PICKERING, J., concurring in part and dissenting in part:

This case comes before the court on the emergency motion of appellant Valley Health System, LLC, dba Centennial Hills (Centennial Hills). The motion challenges the chief justice's appointment of two retired senior justices to sit in place of two current justices, who voluntarily disqualified themselves under NRS 1.225(3). Article 6, section 4(2) of the Nevada Constitution provides that "[i]n case of the disability or disqualification, for any cause, of a justice of the Supreme Court, the Governor may designate a judge of the court of appeals or a district judge to sit in the place of the disqualified or disabled justice." A separate provision of the Nevada Constitution, article 6, section 19, more generally declares that the "chief justice is the administrative head of the court system" who, as such, "may . . . [r]ecall to active service any retired justice or judge of the court system who consents to such recall . . . and may assign him to appropriate temporary duty within the court system." These provisions raise an important question in their overlap—does the chief justice's power to assign senior justices to temporary duty extend to filling a vacancy arising in a supreme court en banc case when a justice is disqualified from that case?

In its opinion, the majority finds no conflict between sections 4(2) and 19 and broadly holds that the chief justice may replace a disqualified justice with a senior justice. Public confidence in the legitimacy of the judiciary depends on the utmost transparency regarding questions of judicial assignments. For that reason, while our results are the same, I analyze the constitutional question differently and conclude that it is closer and affords a narrower permission than the majority suggests. Furthermore, and more importantly, I respectfully submit that the method

of selection should be random, as provided for gubernatorial selections under Internal Operating Procedure (IOP) 1(g)(4); that the same method should be used by both the governor and the chief justice out of respect for their shared power; and that a replacement is only necessary in en banc cases to "avert a possible tie vote," IOP 1(g)(2). Because the IOPs do not adequately define a random or evenly applied method, and because two justices were disqualified, leaving both a quorum of four and an uneven number of five to hear this case without risking a tie, I respectfully dissent to the extent the majority's opinion endorses a selection process that differs from the random process used for gubernatorial selections.

I.

Beginning on ground fully shared: The senior judge program authorized by the 1976 addition of article 6, section 19(1)(c) to the Nevada Constitution has hugely benefited Nevada's trial and appellate court systems, expanding the pool of experienced judges available without the expense of more judgeships. Nor is it disputed that under article 6, section 19(1)(c), the chief justice can recall and assign a retired, senior justice to "appropriate temporary duty" in the supreme court—for example, finishing up the cases left by a justice who retires midterm while the permanent replacement process runs its course. *See, e.g.*, *Nev. Yellow Cab Corp. v. State*, No. 83014, 2022 WL 17367603 (Nev. Dec. 1, 2022) (Order of Affirmance) (Senior Justice Gibbons filling in for retired Justice Silver, who retired effective September 29, 2022). The question is whether appointing a senior justice to replace a disqualified justice is an "*appropriate* temporary duty" within the meaning of article 6, section 19(1)(c), given the specific provision article 6, section 4(2) makes for the governor to appoint a court of appeals or district judge to serve in a case of disqualification or disability.

A court must interpret constitutional provisions reasonably, 6 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 23.11 (4th ed. 2023 update), as the voters who enacted it would, *Strickland v. Waymire*, 126 Nev. 230, 234, 235 P.3d 605, 608 (2010), and in a way that "will prevent any clause, sentence or word from being superfluous, void or insignificant," *id.* at 236, 235 P.3d at 610 (quoting *Youngs v. Hall*, 9 Nev. 212, 222 (1874)). Drawing on these principles, Centennial Hills argues that a reasonable reader could conclude that assignment to temporary duty is not "appropriate" if the person making the appointment lacks authority to do so. In its view, given the specific provision article 6, section 4 makes for the governor to replace a disqualified justice with a court of appeals or district judge, the chief justice lacks authority to replace a disqualified justice with a senior justice.

Article 6, section 4 provides that the governor "may" appoint a court of appeals or district court judge to replace a disqualified justice. The use of "may" connotes permission, not mandate, and supports the majority's conclusion that sections 4(2) and 19(1)(c) are complementary, not conflicting. *See* majority op. at 11 (citing *Piroozi v. Eighth Judicial Dist. Court*, 131 Nev. 1004, 1009, 363 P.3d 1168, 1172 (2015)). But "may" can as easily be read to say the governor has the choice: He or she can—but has the discretion not to—appoint a replacement for a disqualified justice. Further complicating matters is NRS 1.225(5)(a),[1] which provides that

> [u]pon the disqualification of [a] justice of the
> Supreme Court under this section, a judge of the

---

[1]NRS 1.225 provides for the disqualification of a justice for actual or implied bias and provides in subsection 3 that "[a] justice of the Supreme Court . . . , upon his or her own motion, may disqualify himself or herself from acting in any matter upon the ground of actual or implied bias."

SUPREME COURT
OF
NEVADA

(O) 1947A

Court of Appeals or district judge *shall* be designated to sit in place of the justice [by the governor] as provided in Section 4 of Article 6 of the Constitution.

(emphasis added). Enacted in 1957, two decades before article 6, section 19(1)(c) was added to the Nevada Constitution, *see* 1957 Nev. Stat., ch. 314, at 521, NRS 1.225(5) has survived without change, except for its amendment in 2013 to make similar provision for the governor to appoint a district judge to sit in place of a disqualified court of appeals judge, *see* 2013 Nev. Stat., ch. 343, at 1711. The parties do not cite, and so the majority opinion does not address, NRS 1.225(5)(a)'s seeming mandate to use the gubernatorial appointment route in article 6, section 4 in replacing a disqualified supreme court justice.

The opinion does not dwell on the language of the two constitutional provisions. Instead, it shifts focus to history and "contemporaneous construction" and concludes that the chief justice's "authorization [under section 19(1)(c)] has long been understood to include the power to assign senior justices in cases of supreme court disqualification." Majority op., *supra*, at 7. Citing *Covington Brothers v. Valley Plastering, Inc.*, 93 Nev. 355, 363 n.4, 566 P.2d 814, 819 n.4 (1977)—which the opinion emphasizes was decided on July 1, 1977, the day article 6, section 19(1)(c) took effect, majority op., *supra*, at 9—the majority states that "the chief justice's power to assign senior justices to temporary service was used immediately to obtain substitutes for supreme court justices in cases of disqualification and otherwise, sometimes in conjunction with the governor's power to designate district judges." Majority op., *supra*, at 9. But the majority's reliance on *Covington* is misplaced. The docket sheet in *Covington Brothers*, No. 8519, shows that it was orally argued on December 16, 1976, when Justice Zenoff was an active member of the court,

SUPREME COURT
OF
NEVADA

(O) 1947A

4

and resolved by opinion on July 1, 1977, with Justice Zenoff still participating despite his midterm retirement effective April 30, 1977. *See* https://nvcourts.gov/aoc/judicialhistory (last visited June 19, 2023). Justice Zenoff was not named to sit in place of a disqualified justice; he returned to complete a case he deliberated on before he retired. This qualifies as "appropriate temporary duty" under the then-newly enacted section 19(1)(c), but it does not address the more specific issue of replacement of a sitting justice who is "disabled or disqualified" under section 4.

Nor does Supreme Court Rule (SCR) 243, as adopted in 1977 and transferred to SCR 10 in 1979, resolve the tension between sections 4(2) and 19(1)(c). True, SCR 243 implemented the then-newly adopted section 19's permission to use senior justices and judges, but it did so in general terms—"A senior justice or judge, with his consent, is eligible for temporary assignment to any state court at or below the level of the court in which he was serving at the time of his retirement." *See* majority op., *supra*, at 7 (quoting this sentence from SCR 243(2) (1977)). And the next sentence of SCR 243(2) stated that, "[i]f designated by the governor, at the request of the chief justice, a senior judge may also hear specific cases in the supreme court upon disqualification of a justice thereof." *See also* SCR 243(3) (1977) (stating that "in the case of a senior judge assigned to hear and determine a case in the supreme court, the governor shall issue a special commission, as in the case of other judges of the district court"). SCR 243's specific reference to gubernatorial appointment of senior judges in cases of a justice's disqualification and its silence as to the chief justice's appointment of senior justices in the same instance suggests the opposite historical understanding than the majority claims for it and is, at best, ambiguous.

For historical evidence to sway constitutional interpretation, it should clearly evidence the contemporaneous understanding of the adopters themselves—here, the voters. *See Strickland*, 126 Nev. at 239, 235 P.3d at 611 (considering ballot materials as evidence of the voters' contemporaneous understanding of a constitutional amendment). Here, the ballot materials the 1976 voters received on article 6, section 19 explaining the measure said *nothing* about the interaction between article 6, section 4 and proposed section 19, even though a technical amendment to article 6, section 4 was presented to and passed by them in the same election. *See* Constitutional Amendments and Other Propositions to Be Voted Upon in State of Nevada at General Election, November 2, 1976, Question No. 6 (adding section 19(1) to article 6) and Question 7 (making a technical amendment to article 6, section 4 (available at Nevada LCB Library and https://www.leg.state.nv.us/Division/Research/VoteNV/ BallotQuestions/1976.pdf (last visited June 22, 2023)). I acknowledge that, in the near half-century that has followed section 19(1)(c)'s adoption, there have been cases in which a chief justice has appointed a senior justice to replace a disqualified justice. *See* majority op., at 9-10 nn.7 & 8 (collecting cases). But this seems more a matter of individual interpretation by Nevada's successive chief justices, *see* Nev. Const. art. 6, § 3 (providing for a rotating chief justice) than evidence of the contemporaneous understanding of the voters who approved section 19(1)(c)'s adoption in 1976. On this record, I submit, history and contemporaneous construction do not offer much to the analysis.

And so, I return to the text of sections 4 and 19(1)(c) and the evident purpose each serves. Before section 4(2)'s adoption in 1920, Nevada's then-three-justice supreme court had no way to replace an absent or disqualified

Supreme Court
OF
Nevada

(O) 1947A

justice, creating the risk of deadlock in tie-vote cases. Like most states, Nevada opted to provide a means to appoint a replacement justice. *See* Don R. Willett, *Supreme Stalemates: Chalices, Jack-O'-Lanterns, and Other State High Court Tiebreakers*, 169 U. Pa. L. Rev. 441, 448 (2021) (noting that 37 states make provision to replace an absent or disqualified justice). The choice of the governor, as opposed to the court or its chief justice, to pick the temporary replacement is one other states have made and does not appear policy-driven. *See id.* at 485. When section 19 was added in 1976, it conferred administrative powers on the chief justice in terms other states have interpreted to permit appointment of senior justices to sit in place of disqualified justices. *See Legacy Found. Action Fund v. Citizens Clean Elections Comm'n*, 524 P.3d 1141, 1143 (Ariz. 2023); *Commonwealth v. Wetton*, 648 A.2d 524, 526 (Pa. 1994). Allowing the governor and the court to share replacement-justice appointment powers, while unusual, is not unique. *See* Willett, *supra*, at 494-95 (discussing the practice in Tennessee). Given the use of the permissive "may" in section 4(2)'s gubernatorial appointment powers, I therefore conclude, as does the majority, that sections 4(2) and 19(1)(c) do not conflict and can reasonably be read in harmony with one another.[2]

---

[2]I acknowledge that this interpretation conflicts with NRS 1.225(5), which seems to mandate gubernatorial appointment. But in cases involving conflict between constitutional and statutory text, the former prevails. *See Thomas v. Nev. Yellow Cab Corp.*, 130 Nev. 484, 489, 327 P.3d 518, 521 (2014) ("Statutes are construed to accord with constitutions, not vice versa."). Nor does it make section 4(2) meaningless, as Centennial Hills argues, because the governor alone has the power to commission a district court judge to sit in place of a disqualified justice, a power the chief justice does not appear to have.

## II.

More important than who appoints whom, however, is when and by what method the selection is made. Discretionary selection in individual cases has provoked controversy in states elsewhere because it can "seem to invite political considerations to enter and perhaps dominate the process." James C. Brent, *Stacking the Deck? An Empirical Analysis of Agreement Rates Between Pro Tempore Justices and Chief Justices of California, 1977-2003*, 27 Just. Sys. J. 14, 14 (2006) (discussing discretionary selection in California); *see* Willett, *supra*, at 489 (describing "an extraordinary crisis" that arose from certain temporary assignments in New Hampshire); *id.* at 492 (summarizing the appointment process in West Virginia); and *id.* at 501-11 (detailing the "angst" caused by the divergent tiebreaking approaches of various states). The model code of judicial conduct acknowledges as a foundational principle that even when all is not as it seems, the appearance of judicial impropriety damages the public trust equal to any fact. *See* ABA Model Code of Judicial Conduct Preamble. In recognition of this reality, many of our sister states have enacted "apolitical and mechanical" methods that provide for rotating or random selection from an available pool of substitutes, thereby removing the threat of such damage. Brent, *supra*, at 14 (noting neutral methods such as picking names from a jar or selecting them alphabetically); *see* Willet, *supra*, at 448 (explaining that in Louisiana the clerk draws a name from a Jack-o-Lantern).

This court has not kept up with these developments. Our Internal Operating Procedures (IOPs), first adopted in 2002, *see In re: Nev. Supreme Court IOPs*, ADKT 288 (Order Adopting Nevada Supreme Court Internal Operating Procedures, July 26, 2002), have variously provided for random selection from index cards naming both the eligible district court

SUPREME COURT
OF
NEVADA




judges and senior supreme court justices, *see id.* IOP 1(b)(3) (Order, filed July 28, 2007), to selection solely by the chief justice, *see id.* (Order filed December 24, 2008), to a mix that specifies random selection of a district judge's name to send to the governor but that gives the chief justice the power to choose the selection method for senior justices, *see id.* (Order filed May 9, 2013). *See also* Willett, *supra*, at 493-94 (describing Nevada's "random, index-card selection" based on a 2016 interview with the former clerk of the court). Even today, the IOPs remain unclear as to the process by which replacement judges and justices are chosen to replace disqualified or disabled justices in particular cases. Ideally, the selection process would be clearly laid out and as randomized as possible. But regardless of the process chosen, if the governor and the chief justice share the power to replace disqualified justices in individual cases, as both the majority and I have concluded, that power and responsibility is not truly shared or equal between branches if they do not employ the same selection method. If, for instance, the governor must select from a list of names provided by the chief justice, while the chief justice retains for himself or herself total discretion, this court loses credibility in the eyes of the citizenry and unevenly discharges its shared power.

Furthermore, while the IOPs do not currently provide a uniform, randomized process for replacing disqualified justices, they do specify under what circumstances a substitution is to be made in an en banc case. Four justices are necessary for an en banc quorum. *See* IOP 1(e). "To avert a possible tie vote in en banc matters, the court will endeavor to convene a quorum comprised of an odd number of justices before taking the matter under submission." IOP 1(g)(2). In this case, two justices disqualified themselves, leaving five justices to hear the case. This court

has heard cases before under such circumstances without seating additional justices, and the majority does not articulate why additional justices are needed in this case.

As noted, I concur with the majority in deeming the governor's and the chief justice's appointment powers complementary and in denying Centennial Hills' objection and motion on that basis. But I respectfully dissent from the majority's opinion to the extent it endorses a disparate, discretionary approach to judicial replacements in cases involving judicial disqualification.

_____, J.
Pickering